Carol Lynn BROWN and Joseph Dean Cooper, Respondents Below, Appellants,

v.

DIVISION OF FAMILY SERVICES and Casa, Petitioners Below, Appellees.

No. 28, 2001.

Supreme Court of Delaware.

Submitted: Oct. 24, 2001.
Decided: Jan. 29, 2002.

Margaret R. Cooper, Esquire, Hudson, Jones, Jaywork & Fisher, Rehoboth Beach, Delaware, for appellants.

Kristin S. Gibbons, Esquire, Georgetown, Delaware, for Court Appointed Special Advocate.

James S. Reichert, Esquire, Department of Justice, Georgetown, Delaware, Peter S. Feliceangeli, Esquire and Michael L. Ripple, Esquire, Department of Justice, Wilmington, Delaware, for appellee, Division of Family Services.

Tania M. Culley, Esquire and Mary Catherine Landis, Esquire, Office of the Child Advocate, Wilmington, Delaware, amicus curiae.

Before VEASEY, Chief Justice, WALSH, HOLLAND, BERGER and STEELE, Justices (constituting the Court en Banc).

HOLLAND, Justice.

The respondents-appellants, Carol Lynne Brown ("Mother") and Joseph Dean Cooper ("Father"), acting *pro se*, filed a timely notice of appeal with this Court from a final judgment of the Family Court. Pursuant to that judgment, the Family Court granted the petitioner-appellee's, the Division of Family Services ("DFS"), petition to terminate the Mother's and Father's parental rights. This Court appointed Margaret R. Cooper, Esquire to represent the Mother and Father on appeal. This Court also asked the Office of the Child Advocate to appear as an *amicus curiae*.[1]

The parents have raised two issues on appeal. First, the Mother and Father contend that their due process rights under the United States Constitution were violated by the insufficiency of the termination proceedings and the failure of the Family Court to institute such safeguards as would have protected against the erroneous deprivation of the Mother's and Father's parental rights. Second, the parents' submit that the Family Court's decision to terminate the Mother's and Father's parental rights to their two minor children was not supported by clear and convincing evidence and was not the result of an orderly and logical deductive reasoning process.

We have concluded that the Family Court must revise the notice it gives to parents in future termination of parental rights proceedings in order to provide a meaningful opportunity for them to request the appointment of counsel. In this case, since the parents were not advised of their right to request court-appointed counsel, we reverse the judgments of the Family Court and remand for a *Lassiter* hearing.

*Facts*

The Mother and Father are the parents of two minor children who were the subject of termination proceedings in the Family Court. The DFS became involved with the Mother, the Father and the two minor children in August 1999 as a result of allegations of neglect and lack of supervision. Emergency custody of the two minor children was granted to the DFS by the Family Court on August 26, 1999. The two minor children were examined at the A.I. duPont Hospital for Children in Wilmington on September 7, 2000, by Dr. DeJong, who concluded that although the minor children's injuries and behavior

1. The Court gratefully acknowledges and sincerely appreciates the very helpful participation of the Office of the Child Advocate as an *amicus curiae* in this appeal.

were suspicious, no further medical treatment was warranted.

The Mother and Father did not appear at the probable cause hearing on September 8, 1999. The DFS transferred the case to a treatment worker on October 29, 1999. By order of the Family Court dated December 2, 1999, Mary Ann Hammond, a Court Appointed Special Advocate ("CASA"), was appointed for the two minor children who were the subject of the dependency and neglect proceedings.[2]

From October 29, 1999 to December 23, 1999, the Mother and Father attended six of eight scheduled visits. The Mother and Father cancelled the two visits that they did not attend. From December 30, 1999 to January 25, 2000, the Mother and Father visited with the children once. One visit was cancelled due to illness of the children and three visits were cancelled at the mutual agreement of the parties. Only one visit with the children was scheduled during February and that visit was cancelled by the Mother and Father due to their lack of transportation. The Mother and Father missed a visit scheduled for March 13, 2000.

During the time period from September 1999 to approximately February 2000, multiple appointments for psychological and substance abuse evaluations were made by the DFS for the Mother and Father at various mental health agencies. Notwithstanding several cancellations by the Mother and Father, both attended some evaluation appointments at Sussex County Counseling. The Mother failed to complete her evaluations, although she did see a psychologist of her own choosing. When the Mother was dismissed for financial reasons from the psychologist's services, she failed to attend later appointments for evaluations scheduled at People's Place II and Delaware Guidance. The Father's psychological evaluation had been completed on February 15, 2000.

On March 17, 2000, the case was transferred by the DFS to an intensive reunification worker, who met with the Mother and Father at their residence after they missed the March 13, 2000 visit with their children. The Father, but not the Mother, attended the adjudicatory hearing which was held on April 27, 2000. At the hearing, the Father expressed a desire to establish a residence away from the Mother. A meeting was scheduled at which he and the DFS reunification worker were to develop a proposal to incorporate the Father's new plan.

On May 25, 2000, a dispositional hearing was held. The Father signed a case plan pursuant to which he was to do the following: undergo psychological and substance abuse evaluations and comply with any recommendations, allow the DFS access to his home, visit with the children twice a month for a minimum of one hour per session, maintain contact with the DFS and participate in the children's medical appointments. The Father complied with the recommendation to complete a parenting education class.

**2.** The appointment of a CASA is authorized under title 31, chapter 36 of the Delaware Code and Family Court Civil Rule 205. Under section 3601(a), the purpose of the CASA Program is "to ensure that children who are the subject of [custody, visitation, guardianship, termination of parental rights, adoption and other] proceedings before the Family Court have their best interests represented in those proceedings." Family Court Civil Rule 205(a) authorizes the appointment of a CASA to "conduct an independent investigation of the circumstances of a case." A CASA, under Family Court Civil Rule 205(b), must then "report to the [Family] Court the findings of the investigation and may make recommendations to the [Family] Court as to what is in the best interest of the child."

From June 14, 2000 to July 28, 2000, the Father visited with the children five times. The Mother attended four of these visits. The Father attended a substance abuse evaluation on August 2, 2000. The evaluation resulted, however, in a recommendation that the Father receive substance abuse treatment.

On August 3, 2000, the Father, but not the Mother, attended a permanency hearing in the Family Court. On August 3, 2000, the Family Court approved the DFS' goal of changing the permanency plan from reunification to termination of parental rights. On August 24, 2000, the DFS filed a Petition for Termination and Transfer of Parental Rights with the Family Court of the State of Delaware in and for Sussex County.

*Dependency and Neglect Continuum*

It is now well established that a petition to terminate parental rights is one of the two possible end stages in the three-part continuum that usually begins with a dependency and neglect proceeding. In that regard, this case was typical. In August of 1999, the DFS received allegations of neglect and inadequate supervision of the minor children by the Mother and Father.

According to a "social report" prepared by the DFS and entered into evidence at the termination hearing, an investigator with the DFS went to the parents' home to investigate these allegations on three separate occasions. A fourth visit on August 26, 1999, conducted by two members of the DFS and an officer with the Delaware State Police, resulted in removal of the children from the parents' home. That same day, the Family Court granted emergency custody to the DFS and the children were placed into the care of foster parents.

The second stage in the dependency and neglect continuum involves the State's obligation to try to reunite the family, if possible. In that regard, this case was also typical. Supervised visits were established for the family. Both parents were ordered to undergo psychological and substance abuse evaluations. Beginning with the second scheduled visit with their children on September 8, 1999, a pattern emerged of a failure of both parents, particularly the Mother, to attend consistently visitations with the children and counseling sessions ordered by the DFS.

The final stage in the dependency and neglect continuum is either a successful reunification of the family or a decision that the best interests of the child or children requires a termination of parental rights. In this case, the DFS decided to take the latter course of action. Because of the parents continuing failure to attend regular evaluations and to visit consistently their children, and the Father's failure to move out of the Mother's residence as he had promised, the DFS Permanency Committee approved a change in goal to the termination of parental rights based on a "failure to plan." [3]

*Termination Proceedings*

The grounds for the Petition for the Termination of Parental Rights were that the Mother and Father had failed to plan for their two minor children pursuant to title 13, section 1103(a)(5) of the Delaware Code. As a part of the Petition for the Termination of Parental Rights, an order setting a hearing date for December 21, 2000 was entered by the Family Court and

---

**3.** Del.Code. Ann. tit. 13, § 1103(a)(5) (1999). The DFS staff member assigned to this case had requested the goal be changed to termination of parental rights on May 3, 2000.

The DFS Permanency Committee recommended that the staff worker work with the Father for two more months and present the case again on July 5, 2000.

personally served upon the Mother and Father. Neither the Mother nor the Father filed an Answer to the Petition for the Termination of Parental Rights.

An evidentiary hearing was held on December 21, 2000. JoEllen Kimmey of the DFS with a Deputy Attorney General, James Reichert, Esquire as her counsel, and Mary Ann Hammond, a CASA, with Kristin Gibbons, Esquire as her counsel, attended the hearing. Neither the Mother nor the Father appeared at the hearing. The DFS submitted documentary evidence and testimony while the CASA submitted testimony.

At the conclusion of the hearing, the Family Court ruled that the DFS had established by clear and convincing evidence that the statutory grounds for the termination of parental rights had been met. A written order was entered on December 21, 2000 terminating the Mother's and Father's parental rights in their two minor children.

The Father called Family Court on December 22, 2000, in the mistaken belief that the termination hearing was scheduled that day. He was told that the hearing had been held the day before, his parental rights had been terminated and his only recourse was to appeal to this Court.

### Right to Counsel Claim

The Mother and Father contend that their parental rights were terminated in a manner that violated their rights to due process as guaranteed by the Fourteenth Amendment of the United States Constitution. In particular, the parents allege that the Family Court erred as a matter of law by not *sua sponte* appointing an attorney to represent them in the termination proceeding. We have concluded that the record does not support their argument.

In this case, the parents' right to counsel argument must be examined in the context of prior decisional law, recent changes in the federal law, current practices in the Family Court and what the record reflects about the conduct of these specific parents. That examination has led us to conclude that there have been substantial dynamic statutory and procedural developments since the United States Supreme Court and this Court last addressed the right to counsel in termination of parental rights proceedings. Nevertheless, there remains a distinct difference between the right to counsel in a termination proceeding that is mandated by the United States Constitution and what the United States Supreme Court has characterized as the informed practices in the overwhelming majority of other states.

Three questions are implicated in this appeal. First, who has the right to be represented by an attorney at the State's expense? Second, when does that right attach? Third, if there is a right to be represented by counsel at State expense, when and how is that made known?

### Dependency and Neglect Proceeding Representation

We begin our examination of the right to counsel in a termination of parental rights proceeding by considering the right to counsel, if any, at the first stage of the dependency and neglect continuum. When *Lassiter v. Department of Social Services* was decided twenty years ago, the United States Supreme Court noted that "wise public policy ... may require that higher standards be adopted than those minimally tolerable under the [United States] Constitution."[4] It then noted that "[i]nformed opinion has clearly come to hold that an

4. *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 33, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981).

indigent parent is entitled to the assistance of appointed counsel not only in parental termination proceedings, *but [also] in dependency and neglect proceedings as well.*" [5]

In 1995, Delaware was awarded a federal grant to assess and improve Delaware's child welfare system. This program provided "the first opportunity for systematic study of the court's handling of child welfare cases and present[ed] a challenge for Delaware to take the important steps to reform." [6] The grant was administered by the National Children's Bureau in conjunction with several non-profit organizations.[7] It demonstrated a trend at the national level to improve outcomes for children who are in foster care by instituting timely decision-making, judicial oversight and informed permanency decisions.[8]

In May 1997, this Court released the findings and recommendations that resulted from the Delaware Court Improvement Project grant.[9] One of those final recommendations was that every indigent parent and child should have representation in child welfare proceedings from the inception of a dependency and neglect proceeding.[10] At about the same time, the United States Congress passed the Adoption and Safe Families Act of 1997 ("ASFA"). Upon its passage, the ASFA mandated that a "child's health and safety shall be the paramount concern" and that the State should be making timely permanency decisions for children.[11]

The ASFA aspires to achieve permanency for children by speeding up the entire welfare process out of a concern "that too many children in [the United States] are spending the most important formative years in a legal limbo." [12] Except in limited circumstances, states are required to file for the termination of parental rights for any child who has been in state foster care for fifteen out of the last twenty-two months in order to qualify for federal funding.[13] The ASFA also requires that each state formulate a system for conducting a permanency hearing for each child, once the child has been in state foster care for twelve months.[14] The purpose of the permanency hearing is to approve a "permanency plan for the child that includes whether, and if applicable when, the child will be returned to the parent, placed for adoption and the State will file a petition for termination of parental rights, or referred for legal guardianship, or ... placed in another planned permanent living arrangement ...." [15] This Court has acknowledged the rights of children to have timely permanency decisions made on

**5.** *Id.* at 33–34, 101 S.Ct. 2153 (emphasis added).

**6.** Court Improvement Project of the Delaware Supreme Court, *An Assessment of Delaware's Court Performance in Child Welfare Cases with Recommendations for Improvement* 3 (1997) [hereinafter CIP].

**7.** *Id.*

**8.** National Council of Juvenile and Family Court Judges, *Resource Guidelines: Improving Court Practice in Child Abuse & Neglect Cases* 10–11 (1995).

**9.** CIP, *supra,* at 3.

**10.** *See* CIP, *supra,* at 89.

**11.** 42 U.S.C. §§ 671(a)(15)(A), 675(5)(E) (1998).

**12.** Kathleen A. Bailie, Note, *The Other "Neglected" Parties in Child Protective Proceedings: Parents in Poverty and the Role of the Lawyers Who Represent Them,* 66 Fordham L.Rev. 2285, 2291–92 (1998).

**13.** 42 U.S.C. § 675(5)(E).

**14.** *See id.* § 675(5)(C).

**15.** *Id.*

their behalf and to be heard in proceedings where their "vital interests are at stake." [16]

Inextricably intertwined with the goal of achieving permanency for children is the issue of legal representation for all parties in child welfare proceedings, preferably *ab initio* when a child enters foster care. The ASFA mandates that states develop a system to provide legal representation for children in dependency and neglect proceedings. That legal representation is provided for Delaware children who are in foster care, indirectly, by the attorneys for each CASA and, directly, by the recent statutory establishment of the Office of the Child Advocate.[17] The enabling legislation requires that the Office of the Child Advocate implement a program of legal representation for Delaware's abused, neglected and dependent children.[18] Legal representation in a dependency and neglect proceeding is provided for the DFS at State expense by Deputy Attorneys General.

Consequently, at the present time, the only parties to a dependency and neglect proceeding who are not provided with representation are the indigent parents. The *Guidelines for Public Policy and State Legislation Governing Permanence for Children* ("Guidelines"), however, specifically recommend that "[s]tates guarantee that counsel represent biological parents (or legal guardians) at all court hearings, including at the preliminary protective proceeding. Such representation should be provided at government expense when the parent or guardian is indigent." [19] The Guidelines also state the following:

Children's interests are not well served unless all parties have good legal representation. Courts face difficult decisions about how best to protect children, and judges need to be confident that they are reaching the best-informed decision about a child's future. Given that attorneys and other advocates often determine what information a judge is presented with, it is vital that all parties in child abuse and neglect cases have adequate access to competent representation so that judges can make informed decisions.[20]

The indigent parents of children who have been placed in foster care are not only without economic resources but are also often dysfunctional, usually due to parental substance abuse.[21] Children cannot be safely and successfully reunited with their parents unless the conditions that led to the judicial determination of dependency and neglect are corrected permanently. Respected authorities have concluded that it is unrealistic to expect that these already challenged indigent parents will turn their lives around, especially on the accelerated ASFA time table, without an attorney to advocate their need for

---

16. *In re Frazer*, 721 A.2d 920, 923 (Del.1998); *see Shepherd v. Clemens*, 752 A.2d 533, 538–39 (Del.2000).

17. The Office of the Child Advocate is an independent state agency created in June of 1999 that is charged with safeguarding the welfare of Delaware's children. Del.Code. Ann. tit. 29, §§ 9001A—9008A (Supp.2000).

18. Del.Code Ann. tit. 29, § 9007A(a)(1). Under this program, an attorney guardian *ad litem* is appointed by the Family Court to "[r]epresent the best interests of the child in all child welfare proceedings." *See id.*

§ 9007A(c)(1). In furtherance of this mandate, the Office of the Child Advocate has employed a Deputy Child Advocate and has developed a program of *pro bono* representation of children by Delaware lawyers.

19. Donald N. Duquette & Mark Hardin, U.S. Dep't of Health & Human Servs., *Guidelines for Public Policy and State Legislation Governing Permanence for Children*, VII–5 (1999).

20. *Id.* at VII–1.

21. Bailie, *supra,* at 2331 n. 50.

the reunification resources that are available through the DFS.[22]

Today, more than one-half of the states have established a right for indigent parents to be represented by counsel at State expense in dependency and neglect proceedings.[23] That right has been recognized in those states by statutory enactments or as a matter of state constitutional law.[24] It is not mandated by the United States Constitution.[25]

As noted earlier, the Delaware Court Improvement Project concluded that it was advisable for all parties to have legal representation in dependency and neglect proceedings.[26] Although the General Assembly has not enacted a statute establishing such a right for indigent parents, it has begun to provide limited funding to the Family Court for the purpose of appointing attorneys to represent indigent parents in dependency and neglect proceedings. During the last two years, this Court has approved IOLTA[27] grants to the Community Legal Aid Society to administer contracts that provide representation for indigent parents in dependency and neglect proceedings in Kent and Sussex Counties.

In its *amicus curiae* brief, the Office of the Child Advocate makes a forceful argument that indigent Delaware parents should have a state constitutional right to counsel in all child dependency and neglect proceedings.[28] This Court has never decided whether an indigent parent has a right to counsel in a dependency and neglect proceeding under the Delaware Constitution. That question is not before us in this case, because the record reflects that the parents were represented during the dependency and neglect proceeding by a private attorney they apparently retained at their own expense.

*Termination Proceeding Representation*

In *Lassiter v. Department of Social Services*,[29] the United States Supreme Court held that the United States Constitution does not require "the appointment of counsel in every parental termination proceeding."[30] After reviewing its precedents on the question of the right to appointed counsel, the United States Supreme Court concluded that "as a litigant's interest in personal liberty diminishes, so does his right to appointed counsel."[31] The Supreme Court determined a "presumption that an indigent litigant has a right to appointed counsel *only* when, if he [or she] loses, he [or she] may be deprived of his

22. *See generally* Bailie, *supra;* Raul V. Esquivel, III, Comment, *The Ability of the Indigent to Access the Legal Process in Family Law Matters,* 1 Loy. J. Pub. Int. L. 79 (2000). *Compare* Jennifer L. Saulino, Book Note, *NOTICE Are We Protecting the Wrong Rights?;* 99 Mich. L.Rev. 1455 (2001) (reviewing Elizabeth Bartholet, *Nobody's Children: Abuse and Neglect, Foster Drift, and the Adoption Alternative* (1999)).

23. Rosalie R. Young, *The Right to Appointed Counsel in Termination of Parental Rights Proceedings: The States' Response to Lassiter,* 14 Touro L.Rev. 247, 260 (1997).

24. *Id.*

25. *Lassiter v. Dep't of Soc. Servs.,* 452 U.S. at 31, 101 S.Ct. 2153.

26. *See* CIP, *supra,* at 89.

27. IOLTA is an acronym for Interest on Lawyer Trust Accounts. *See* Supr. Ct. R. 65.

28. *See generally* Bailie, *supra;* Esquivel, *supra.*

29. *Lassiter v. Dep't of Soc. Servs.,* 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981).

30. *Id.* at 31, 101 S.Ct. 2153.

31. *Id.* at 26, 101 S.Ct. 2153.

[or her] liberty." [32]

Accordingly, in termination proceedings, the presumption against a right to appointed counsel, except where the litigant's personal liberty is at stake, is weighed against the sum total of the "three elements to be evaluated in deciding what due process requires, viz., the private interests at stake, the government's interest, and the risk that the procedures used will lead to erroneous decisions." [33] These three elements were formulated by the Supreme Court in *Mathews v. Eldridge*. [34] They are now commonly referred to as the *Eldridge* factors.

In *Lassiter*, the United States Supreme Court concluded that, although in some termination proceedings, the *Eldridge* factors could be weighted in such a manner that their sum total was greater than the presumption against the right to appointed counsel, which would not always be the case. [35] Therefore, rather than require that counsel be provided in all cases, the Supreme Court held that a determination must be made on a case-by-case basis. [36] While adopting a case-by-case standard, the Supreme Court refused " 'to attempt to formulate a precise and detailed set of guidelines to be followed in determining when the providing of counsel is necessary to meet the applicable due process requirements.' " [37]

Pursuant to *Lassiter's* holding, the decision whether due process requires the appointment of counsel for indigent parents in termination proceedings must be answered "in the first instance by the trial court, subject ... to appellate review." [38] When *Lassiter* was decided, however, the United States Supreme Court thought it was "[m]ost significant[ ] [that] 33 States and the District of Columbia provide statutorily for the appointment of counsel in termination cases." [39] Accordingly, the Supreme Court concluded by stating that its holding in *Lassiter* "in no way implies that the standards increasingly urged by informed public opinion and now widely followed by the States are other than enlightened and wise." [40]

As a consequence of the holding in *Lassiter*, the seventeen states that did not provide indigent parents with a right to counsel in termination proceedings were required to examine the matter on a case-by-case basis. Delaware was one of those seventeen states. Since 1981, twelve of the seventeen states have "enacted a broad variety of statutes that require [either] the provision of counsel for indigent parents in every termination proceeding or at the request of the parents involved." [41]

### Delaware's Case–by–Case Approach

This Court first addressed whether the federal due process standards of *Lassiter*

**32.** *Id.* at 26–27, 101 S.Ct. 2153 (emphasis added).

**33.** *Id.* at 27, 101 S.Ct. 2153.

**34.** *Mathews v. Eldridge,* 424 U.S. 319, 334–35, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

**35.** *Lassiter v. Dep't of Soc. Servs.,* 452 U.S. at 31–32, 101 S.Ct. 2153.

**36.** *Id.* at 26, 31–32, 101 S.Ct. 2153.

**37.** *Id.* at 32, 101 S.Ct. 2153 (quoting *Gagnon v. Scarpelli,* 411 U.S. 778, 790, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973)).

**38.** *Id.*

**39.** *Id.* at 34, 101 S.Ct. 2153.

**40.** *Id.*

**41.** *See generally* Rosalie R. Young, *The Right to Appointed Counsel in Termination of Parental Rights Proceedings: The States' Response to Lassiter,* 14 Touro L.Rev. 247, 263 (1997); Joel E. Smith, Annotation, *Right of Indigent Parent to Appointed Counsel in Proceeding for Involuntary Termination of Parental Rights,* 80 A.L.R.3d 1141 (2001).

required the appointment of counsel for an indigent parent in termination of parental rights proceedings in *In re Carolyn S.S.*[42] This Court recognized, as was pointed out in *Lassiter,* that a majority of the states require the appointment of counsel in termination proceedings by statute and that "[s]ince we find Delaware among the minority of the states which have not progressed in this developing area of the law, we take the occasion to call the situation to the attention of the General Assembly."[43] Nevertheless, Delaware is still only one of five states that continue to decide whether to appoint counsel for indigent parents in a termination proceeding by applying the *Eldridge* factors on a case-by-case basis.[44]

At the present time, the Family Court routinely appoints counsel to represent parents who appear, request legal representation and demonstrate indigency in a termination proceeding. The Office of the Child Advocate argues that as a result of the dynamic changes in this area of the law since *Lassiter,* this Court should overrule *In re Carolyn S.S.* and hold that the Delaware Constitution mandates the appointment of counsel for all indigent parents in termination proceedings. That issue is not squarely before us in this case. We will decide that issue when it is presented in a future case if, following a timely request for legal representation, the Family Court ever declines to appoint counsel for an indigent parent in a termination proceeding.

### Current Delaware Termination Procedures

The current practice in the Family Court, which was used in this case, is to serve the parents with the Petition for the Termination of Parental Rights and notice of a hearing date. If the parents do not appear at the scheduled hearing, proper notice is verified, the DFS presents a *prima facie* case and the DFS social report[45] is admitted into evidence. The Family Court satisfies itself that termination of parental rights is in the child's best interest and enters an order. The record reflects that is what happened in this case.

Alternatively, if the parents appear at the hearing and dispute the Petition for the Termination of Parental Rights, the Family Court inquires whether they desire to be represented by an attorney and if they can afford one. If the parents request representation but assert an inability to pay, the Family Court conducts an indigency hearing and appoints counsel if it finds that the parents are indigent. The hearing on the merits of the termination petition is then rescheduled. The DFS submits that the current procedures, once the indigent parents appear, comports with the due process requirements of *Lassiter,* as construed by this Court in *In re Carolyn S.S.*[46]

---

42. *In re Carolyn S.S.,* 498 A.2d 1095 (Del. 1984).

43. *Id.* at 1098–99.

44. Rosalie R. Young, *The Right to Appointed Counsel in Termination of Parental Rights Proceedings: The States' Response to Lassiter,* 14 Touro L.Rev. 247, 260 (1997). The other four states are Hawaii, South Carolina, Tennessee and Wyoming. *Id. See generally* Jennifer Wriggins, *Parental Rights Termination Jurisprudence: Questioning the Framework,* 52 S.C.

L.Rev. 241 (2000); Joel E. Smith, Annotation, *Right of Indigent Parent to Appointed Counsel in Proceeding for Involuntary Termination of Parental Rights,* 80 A.L.R.3d 1141 (2001).

45. Del.Code Ann. tit. 13, § 1105(c) (1999 & Interim Supp.2001).

46. *In re Carolyn S.S.,* 498 A.2d 1095, 1096–97 (Del.1984) (construing *Lassiter v. Dep't of Soc. Servs.,* 452 U.S. 18, 23, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981)).

*Termination Notice Requirements*

There are two difficulties with the current Delaware practice in termination of parental rights proceedings. First, the notice to the parents does not advise them that if they are indigent they may have the right under the United States Constitution, as interpreted in *Lassiter*, to be represented by legal counsel at State expense. Second, to the extent that the Family Court waits to explain that right when the parents appear for the termination hearing, it is doubly unfair. Initially, it is unfair to those indigent parents who fail to appear because they are unaware of the right identified in *Lassiter* to be represented by counsel at State expense.[47] Moreover, it is unfair to the children who must remain in foster care while a hearing on the merits of termination is rescheduled and completed, contrary to the ASFA's goal of achieving permanency for children more quickly by expediting termination proceedings.[48]

■ At the present time, there is nothing in the notice from the Family Court that advises indigent parents that they may be entitled to court-appointed legal representation.[49] In *Lassiter*, the United States Supreme Court stated that due process in the United States Constitution is not a fixed concept but implicitly means "fundamental fairness" in the context of specific circumstances.[50] The Delaware Constitution explicitly states that due process requires that "justice [be] administered according to the very right of the cause . . . ."[51] To the extent that indigent parents have a United States constitutional right to counsel at State expense in a termination proceeding, both state and federal due process for such parents and their children require a timely notice of that right.

■ A determination of whether indigent parents intend to contest the Petition for the Termination of Parental Rights and if they are eligible for the appointment of counsel must be moved closer to the commencement of the termination proceeding. The Family Court has done this already in child support civil contempt cases. In *Black v. Division of Child Support Enforcement*,[52] this Court held that an indigent obligor facing incarceration as a sanction in a state-initiated civil contempt proceeding for failure to pay court-

47. Kathleen A. Bailie, Note, *The Other "Neglected" Parties in Child Protective Proceedings: Parents in Poverty and the Role of the Lawyers Who Represent Them,* 66 Fordham L.Rev. 2285, 2307–08 (1998); Rosalie R. Young, *The Right to Appointed Counsel in Termination of Parental Rights Proceedings: The States' Response to Lassiter,* 14 Touro L.Rev. 247, 263–64 (1997). *See generally* Raul V. Esquivel, III, Comment, *The Ability of the Indigent to Access the Legal Process in Family Law Matters,* 1 Loy. J. Pub. Int. L. 79 (2000); Jennifer Wriggins, *Parental Rights Termination Jurisprudence: Questioning the Framework,* 52 S.C. L.Rev. 241 (2000); Joel E. Smith, Annotation, *Right of Indigent Parent to Appointed Counsel in Proceeding for Involuntary Termination of Parental Rights,* 80 A.L.R.3d 1141 (2001).

48. This Court has taken several actions recently to expedite termination proceedings on appeal. We have adopted Supreme Court Rule 26.1 which imposes a continuing obligation upon the attorney who represented the parents in the Family Court. Second, when a notice of appeal is filed in a termination proceeding, our Clerk's Office now schedules the case for submission on a date certain that assumes no extensions for the filing of the record or the parties' briefs.

49. *See* Bailie, *supra,* at 2307.

50. *Lassiter v. Dep't of Soc. Servs.,* 452 U.S. 18, 24–25, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981).

51. Del. Const. art. I, § 9.

52. *Black v. Div. of Child Support Enforcement,* 686 A.2d 164 (Del.1996).

ordered child support had a due process right to appointed counsel at State expense.[53] To meet the *Black* mandate and to resolve civil contempt cases expeditiously the Family Court issued Administrative Directive 96.07 on December 19, 1996.

Administrative Directive 96.07 provides that the hearing notice sent to an alleged obligor, who is facing possible incarceration, "shall include information and forms stating that the obligor faces possible incarceration and requesting the obligor to indicate whether he or she claims to be indigent and seeks the appointment of counsel." Generally, an obligor wishing to have appointed counsel files the form of motion that is provided with the notice and includes sworn information relating to indigency. The Family Court decides the motion after the State has had an opportunity to answer. If counsel is appointed, the Court is ready to proceed at the originally scheduled hearing date.

■ In *In re Heller*,[54] this Court held that a parent has a due process right to be heard and to participate meaningfully in the termination proceeding.[55] This Court has also recognized that where fundamental rights are at stake mechanisms must be employed to ensure procedural due process.[56] In this case, we hold that when the Family Court serves a Petition for the Termination of Parental Rights in the future, it must include a notice of the right to counsel at State expense that is guaranteed to indigent parents by the United States Supreme Court's holding in *Lassiter*.

The future notice that is required by our holding in this case must advise a parent how effectively to assert and exercise their *Lassiter* right to representation in a timely manner before the hearing date. A similar method is used in Maryland to inform indigent parents about their statutory entitlement to legal representation in both dependency and termination proceedings.[57] Such notice will protect any *Lassiter* entitlement to counsel of an indigent parent. It will also advance the paramount goal of achieving permanency for the child involved in a termination proceeding.

### Lassiter Due Process

In this case, the record reflects that both parents were served personally with the petition to terminate their parental rights. Both parents also received actual notice of the hearing. Nevertheless, it is undisputed that the parents were not advised in the notice that if they were indigent they might have a right under the United States Constitution to the appointment of legal representation at State expense. The question then becomes whether, in the absence of such notice, the Family Court violated the parents' due process rights under the United States Constitution, as described in *Lassiter*, by proceeding to conduct a hearing on the merits and then deciding to grant the termination petition as to both parents?

It is argued that the Family Court should have *sua sponte* appointed an attorney to represent these parents at the termination hearing because the private attorney who represented them in the dependency and neglect proceedings had developed a conflict of interest. There are several problems with that argument.

---

53. *Id.* at 167.

54. *In re Heller,* 669 A.2d 25 (Del.1995).

55. *Id.* at 32.

56. *See Orville v. Div. of Family Servs.,* 759 A.2d 595, 598 (Del.2000).

57. *In re Adoption/Guardianship No. 93321055/ CAD,* 344 Md. 458, 687 A.2d 681, 692–98 (1997).

First, while a conflict of interest might have resulted in a disqualification of that attorney, it would not *ipso facto* have resulted in the appointment of an attorney for the parents at State expense. Second, the ability to retain private counsel during the dependency and neglect proceedings is at least *prima facie* evidence that the right to counsel afforded by *Lassiter* would not have been available to these parents.

Third, and most importantly, the Family Court never had an opportunity in this case to rule on any of these issues. The parents did not appear at the termination hearing, despite knowing full well that their failure to appear would probably result in a termination of their parental rights. In *Lassiter*, the United States Supreme Court held that the failure of the parents to appear for a hearing was a valid consideration.[58] More recently, the Supreme Judicial Court of Massachusetts held that before the constitutional right to counsel "attaches, a parent must first come forward and appear, or in some way indicate a desire to be heard or to contest the petition, and must demonstrate his or her indigence." [59]

The record reflects that present at the December 21, 2000 hearing was a representative from the DFS with her attorney and a CASA with her attorney. The parents were not in attendance. The Family Court Judge noted that personal service had been made on both parents. The Deputy Attorney General, representing the DFS, advised the Family Court that the Father was aware of the hearing. The CASA testified that the Father was "quite aware of today's hearing, and he had planned to come." Before beginning the hearing, the Family Court Judge instruct-ed a judicial assistant to ascertain whether the parents were mistakenly waiting outside the courtroom.

The record reflects that when the termination hearing was convened in this case, the Family Court Judge knew several things: the parents had retained private counsel to represent them in the prior dependency and neglect proceedings, the parents knew that the State had changed its focus from reunification to termination, the parents had been served personally with the termination petition, the parents had actual knowledge of the hearing date and the parents failed to appear. There was no record basis for the Family Court Judge to believe that the parents were either indigent and eligible to have counsel appointed for them at State expense pursuant to *Lassiter* or that they were interested in contesting the termination petition on the merits. Accordingly, the Family Court Judge went forward with the termination hearing.

■ The Father called the Family Court on December 22, 2000 in the mistaken belief that the termination hearing was set for that day. We now know from the parents' appointed counsel on appeal, however, that both parents were interested in contesting the termination petition and that they might be eligible to have counsel appointed for them at State expense. If the Father had appeared on the day of the hearing, requested counsel and demonstrated indigency, his request would have been granted by the Family Court. Given these facts, we conclude that the parents should be given the opportunity to request counsel and demonstrate indigency, and if successful have counsel represent their interests at a new termination hearing. Mindful of the impact that such delay has

---

**58.** *Lassiter v. Dep't of Soc. Servs.,* 452 U.S. 18, 32–33, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981).

**59.** *Adoption of Holly,* 432 Mass. 680, 738 N.E.2d 1115, 1120–21 (2000).

on the children, we instruct the Family Court to schedule this matter on an accelerated, priority basis.

### Conclusion

The judgment of the Family Court is reversed. This matter is remanded to the Family Court with directions to hold both the *Lassiter* hearing and the termination hearing on an expedited basis. The Family Court is directed to file its final decision with this Court within sixty days of the date of this opinion. Jurisdiction is retained.[60]

---

**60.** Supr. Ct. R. 19(c).