and, thus, that Glazer should have warned the other Big Lots directors of that fact. The court must grant the defendants' motion to dismiss this claim because Big Lots has failed to sufficiently allege that Glazer actually knew or actually had reason to know that the 2002 transaction would happen. Instead, just as Big Lots would have the court infer that the proximity of the 2002 transaction and the 2004 bankruptcy means that the two are connected, it insists that the proximity of the 2000 and 2002 transactions means that Glazer knew or should have known in 2000 that the 2002 transaction was inevitable. Much more than this effort to plead knowledge in the alternative is required where a plaintiff bases a claim on a director's duty to disclose, a duty which our courts have only invoked in cases where the defendant had clear knowledge of the information at issue.[70]

To hold otherwise here would expose participants in leveraged buyout transactions, where directors or officers of the seller often emerge as directors and officers of the surviving corporation, to subsequent litigation based on mere speculation that a defendant should have known of some transaction planned by the new company within a few years after the sale, and that the transaction would turn out badly. That overly broad conception of liability is not what Delaware courts meant in establishing that a director's fiduciary duty of loyalty includes the duty to disclose known facts to his fellow directors.[71]

## IV.

For the foregoing reasons, the defendants' motions to dismiss are GRANTED as to all counts. IT IS SO ORDERED.

## DIVISION OF FAMILY SERVICES, Petitioner,

### v.

---

Judy MILLER[1] Andrew
Potter, Respondent.

In the Interest of Drew Miller
(d.o.b. 7/6/03).

No. CS04–02362.

Family Court of Delaware.

Submitted: Feb. 22, 2005.
Decided: April 12, 2005.

James S, Reichert, Deputy Attorney General, Department of Justice, State of Delaware, Georgetown, DE, for petitioner.

Bruce Rogers, P.A., Georgetown, DE, for Mother.

Kristin S. Gibbons, Georgetown, DE, for the Court Appointed Special Advocate.

OPINION

MILLMAN, J.

On September 2, 2004, custody of Drew Miller was granted to the Division of Family Services. The mother of this child is Judy Miller. Andrew Potter is the putative father of this child.

The purpose of this hearing is to review mother's Case Plan with the goal of reunification with the child. Unfortunately, the assigned worker to this case was ill on the day of the hearing and the Division had limited information regarding Drew.

The information presented indicated that on November 9, 2004, it was determined that Drew needed speech and occupational therapy. The purpose of the occupational therapy is to give Drew cognitive assistance, motor skills assistance, and communication assistance. The purpose of the physical therapy is to assist Drew in building his muscles. He is 20 months old and is not walking. The occupational and physical therapy is provided to him twice a week by therapists who come to the foster mother's residence.

Drew has had ongoing eye difficulties and was examined by Dr. Rios, who followed up with a report dated October 1, 2004. It is believed that one MRI has been done and that another one is either scheduled or has been completed. The records also indicate that Dr. Rios ordered a CAT–Scan to be performed on October 1, 2004. Dr. Szuhay, a neurologist, is also providing care regarding this issue.

1. Pseudonyms are used to protect the privacy of the parties.

The Division testified it is investigating whether Drew's eye problem is congenital in nature or a result of shaken baby syndrome. Although Drew has been in care since September 2004, as of this hearing, no determination has been made as to the cause of Drew's eye problem. In addition to the eye problem, the Division has some concern that Drew may have excess fluid on the brain. Again, no determination has been made as to this concern as of this date.

The Division was unable to supply information on what dates various appointments were scheduled or took place for Drew's care. Due to the incompleteness of the record with regard to Drew, this matter has been continued until **Tuesday, April 5, 2005, at 11:30 a.m.,** when this review will continue.[2]

### REASONABLE EFFORTS

The Division was unable to provide complete information regarding Drew's care and needs at this hearing. Aside from the Division worker being absent due to illness, the Division contends that the evidence regarding the care and particularized needs of Drew is not a part of the Court's consideration in determining if the Division has used reasonable efforts in this case.

The Division contends that reasonable efforts findings are required from the Court only as to whether the Division exercised reasonable efforts to prevent having to remove a child from his home[3] and whether the Division has used reasonable efforts toward permanency for the child.[4] In short, the Division takes the position that, while it may provide the Court information from time to time as to the welfare of a child in its care, the Division is not required to do so for reasonable efforts purposes. The Division contends that its obligation to use reasonable efforts applies only to the parents.

For the reasons set forth below, the Division's position is found to be without merit. The safety and quality of care of a child in the Division's care is the paramount consideration in the Court's finding of reasonable efforts.

### ADOPTION AND SAFE FAMILIES ACT ("ASFA")

With the adoption of ASFA in November 1997, "[S]afety [became] the paramount concern that must guide all welfare services."[5] This Court had believed that this principle was so ingrained in our statutory and case law that this debate had ended long ago.

### CASE PLAN

Once a child is determined to be dependent in his parents' care, the case plan becomes the road map for the return of the child to the parents' care. Forty-two U.S.C. § 675(1) defines a case plan as a written document which includes at least the following:

> (A) A description of the type of home or institution in which a child is to be

---

**2.** Subsequent to this hearing, on March 18, 2005, the Court received a stack of medical records involving Drew and his brother, Thomas Miller. The Court assumes that the information supplied to the Court has also been supplied to all counsel.

**3.** 42 U.S.C. 671(15)(B)(1).

**4.** *Id.* (ii).

**5.** 42 U.S.C. § 671(a)(15)(A), § 675(5)(E); *Brown v. Division of Family Services*, 803 A.2d 948 at 953, (Del. 2002); Donald N. Duquette and Mark Hardin, U.S. Dep't of Health and Human Services, *Guidelines for Public Policy and State Legislation Governing Permanence for Children*, I–5 (1999).

placed, including a discussion of the safety and appropriateness of the placement and how the agency which is responsible for the child plans to carry out the voluntary placement agreement entered into or judicial determination made with respect to the child in accordance with section 672(a)(1) of this title,

(B) A plan for assuring that the child receives safe and proper care and that services are provided to the parents, child, and foster parents in order to improve the conditions in the parents' home, facilitate return of the child to his own safe home or the permanent placement of the child, and address the needs of the child while in foster care, including a discussion of the appropriateness of the services that have been provided to the child under the plan.

(C) To the extent available and accessible, the health and education records of the child, including—

(i) the names and addresses of the child's health and educational providers;

(ii) the child's grade level performance;

(iii) the child's school record;

(iv) assurances that the child's placement in foster care takes into account proximity to the school in which the child is enrolled at the time of placement;

(v) a record of the child's immunizations;

(vi) the child's known medical problems;

(vii) the child's medications; and

(viii) any other relevant health and education information concerning the child determined to be appropriate by the State agency.

(D) Where appropriate, for a child age 16 or over, a written description of the programs and services which will help such child prepare for the transition from foster care to independent living.

Forty-two U.S.C. § 672(a)(1), as referenced in § 675(1)(A), requires the Court to make certain findings before the Division can receive federal funding. The statute reads in pertinent part:

(1) the removal from the home ... was the result of a judicial determination to the effect that continuation therein would be contrary to the welfare of such child and ... that reasonable efforts of the type described in section 671(a)(15) of this title for a child have been made;

(2) such child's placement and care are the responsibility of (A) the State agency administering the State plan approved under section 671 of this title.

Forty-two U.S.C. § 671(a)(15), as referenced in § 672(a)(1), states:

(A) in determining reasonable efforts to be made with respect to a child, as described in this paragraph, and in making such reasonable efforts, **the child's health and safety shall be the paramount concern;**

(B) except as provided in subparagraph (D), reasonable efforts shall be made to preserve and reunify families—

(i) prior to the placement of a child in foster care, to prevent or eliminate the need for removing the child from the child's home; and

(ii) to make it possible for a child to safely return to the child's home;

Based on the above statutes, this Court cannot enter findings of reasonable efforts for the Division without information re-

garding the health, education, housing and other needs of the child. Indeed, the Court must make findings with respect to the child. Under the case plan and the entire federal statutory scheme of our child welfare program, the primary focus is the child, not the parent. The Division has arbitrarily divided the case plan described in § 675(1) into two parts—one, the "Child Placement Plan" or "PCIC" or "Child in Care Plan", and two, the "PLAN FAM SRV PLAN".

Section 675(1)(A) requires a "description of the type of home [Drew] is in, including a description of the safety and appropriateness of the placement" to be in the case plan. The case plan's only description of Drew's placement is the comment "foster home."

Section 675(1)(A) also requires the Division to explain how it plans to eliminate the need of removing Drew from his home while keeping Drew's health and safety paramount. This requirement demands that the Division not focus on the parent, as argued by the Division, but rather requires the Division to place the child's health and safety paramount to all other concerns.[6]

Section 675(1)(B) also emphasizes the child as the focus in developing the case plan. The plan is to insure that "the child receives safe and proper care" and that "services are provided to the parents, child ... in order to improve the conditions in the parents' home ... and address the needs of [Drew] while in foster care, including **a discussion of the appropriateness of the services that have been provided to [Drew] under the case plan.**"[7]

The case plan also requires under § 675(1)(C) that, to the extent available and acceptable, the following information should be included: the health and education records of Drew, the name(s) of Drew's doctor(s), his immunization records, known medical problems, and medications he is receiving. This information that is required to be in Drew's case plan is not for the sole and exclusive use of the Division. Rather, federal law requires accountability on the part of the Division. The "case review system" under § 675(5) is designed to insure that Drew is in a safe and secure environment, that his placement is appropriate, that the Division is providing in a timely manner the services required by Drew and his family for reunification and that Drew's family is in compliance with the case plan.

The Court must periodically review Drew's case. This prescribed period is six months under the federal statute and three months under Civil Rule 215 of our Court. The review hearings serve several valuable purposes, which include: (1) whether there is a need for continued placement of the child, (2) whether the long-term permanent plan for the child remains the best plan for the child, and (3) whether the agency is making reasonable efforts to rehabilitate the family and eliminate the need for placement of the child.[8]

It has been said of these review hearings,

> Review Hearings provide regular judicial oversight of children in foster care and can help judges identify inadequacies in government's response to child abuse and neglect. For example, incomplete case plans can prolong foster care placement by failing to clearly specify

---

**6.** 42 U.S.C. § 671(A)(15).

**7.** (*Emphasis added.*)

**8.** The National Council of Juvenile and Family Court Judges, *Resource Guideline: Improving Court Practice in Child Abuse and Neglect Cases,* 70–71 (1995).

what each party must do to facilitate family reunification. Agency case plans may be based on boilerplate forms which fail to adequately document a case. A plan may be developed solely by agency staff, **without the collaboration of parents or the child.** (*emphasis added.*) A plan may fail to specify agency services for particular behaviors and changes expected of the parents....

Effective review hearings can address each of these problems and can improve planning for children.... Through careful scrutiny of the case plan by the attorneys and the court, case content and planning problems can be identified. Terms of the plan can be specified so that all parties understand their obligations and the Court can assess progress....

Reviews can malfunction as a rubber stamp of agency recommendations or produce arbitrary decisions based on inadequate information. Effective review requires adequate court time ... and trained lawyers to collectively determine what information comes before the Court. Lawyers must be expected to do their job and come to court with a clear position on the case.[9]

Historically, judges of this Court played a limited role in child welfare proceedings in this Court. A judge would issue an order on an *ex parte* basis removing a child from his home and thereafter hold a probable cause hearing. If the child was found to be dependent, neglected or abused, an adjudicatory hearing was subsequently scheduled before a different judge. At that hearing, if dependency, neglect or abuse was found, the child remained in care and usually the judge's role

ended. A judge usually would not be involved in this case again until a termination of parental rights' action was filed years later or the child was subsequently returned home and once again removed with the process starting over. An 18-month review was held, usually by a master or commissioner, untrained in child welfare procedures.

Delaware was not alone in operating a rudimentary ·case review system. Congress, noting that nationally the number of foster care children had dramatically increased from the passage of the Adoption and Child Welfare Act of 1980 to 1995, the opposite of the purpose of the Act, encouraged states, through financial assistance, to begin reviewing their child welfare systems. In that year, through the offices of the Supreme Court of this State, the Court Improvement Project ("OP") was formed. In May 1997, the Committee issued its report.

As part of the review of the Court's effectiveness in the child welfare system, in court observations were conducted. The reviewers found:

> [T]hat issues concerning placement, services, and evaluations for the child were seldom discussed in detail at court hearings.... [C]ourt observations did not include documents submitted for the Court's review. Documents could detail information about services for the child. However, submission of documents was rare at Probable Cause or Adjudicatory proceedings.[10]

As previously noted, judges' involvement historically ended at the Adjudicatory Hearing and they did not become involved with the case again until the termination of

---

9. *Id.* at 66–67.

10. Court Improvement Project of the Delaware Supreme Court, *An Assessment of Dela-*

*ware's Court Performance in Child Welfare Cases with Recommendations for Improvement* 48 (1997).

parental rights' action was filed. As a result of the work of the Committee, 22 recommendations for improvement, many of which impacted directly on the Court, were made. Through the work ·of the Committee, CIP became an integral part of this Court's work with dependent, neglected and abused children.

To assist the Court in improving the manner in which it dealt with dependency cases, the Court has relied heavily on the *Resource Guidelines: Improving Court Practice in Child Abuse & Neglect Cases* published by the National Council of Juvenile and Family Court Judges. This document became the model by which this Court handles its child welfare cases. *Resource Guidelines* states:

> It is the responsibility of the Judge to hold *all parties accountable for discharging their responsibilities in an effective and responsible manner. Ultimately, however, children are placed according to court orders. Therefore, the juvenile court has the responsibility to hold the entire system accountable.*[11]

11. *Id.* p. 18. (*emphasis added.*)

This Court cannot meet its statutory and rule mandated obligations to children placed in care if it does not have adequate information regarding the care and needs of each child removed from the care of his parents. It is an obligation this Court takes seriously and will not fail to carry out.

## CONCLUSION

The Division cannot be found to have met its reasonable efforts requirement without providing adequate information regarding the care and needs of Drew. This information has not been provided at this hearing. Accordingly,

This matter shall be continued until **Tuesday, April 5, 2005, at 11:30 a.m.**

**IT IS SO ORDERED.**