840 A.2d 114

Deborah FRASE

v.

Cynthia BARNHART, et al.

No. 6, Sept. Term, 2002.

Court of Appeals of Maryland.

Dec. 11, 2003.

Reconsideration Denied Feb. 9, 2004.

Stephen H. Sachs (Wilmer, Cutler & Pickering; Deborah Thompson Eisenberg of Brown, Goldstein & Levy, LLP; Debra Gardner, Wendy N. Hess and Catherine Woolley, Public Justice Center, on brief), Baltimore, for appellant.

Timothy A. Bradford (Kent, Cizek and Treff, on brief), of Denton, for appellees.

Argued before BELL, C.J., ELDRIDGE *, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

WILNER, Judge.

We have before us what began as a custody dispute between Deborah Frase, the mother of three-year-old Brett, and Curtis and Cynthia Barnhart, a couple who, during part of an eight-week period of the mother's incarceration, volunteered to care for Brett and then decided that they wanted custody of the child. The issue at this point is not who should have custody of Brett. The Circuit Court for Caroline County seems to have resolved that in the mother's favor. It is Ms. Frase who complains—that she was not provided free counsel to assist her in defending the action, that the domestic relations master who conducted the evidentiary hearing was conflicted and duty-bound to recuse herself, and that certain conditions that were included as part of the award of custody are impermissible.

There is also a significant procedural issue of whether the appeal is properly before us. That issue arises from two of the conditions attached to the custody determination—conditions that the court refused to strike and that, in effect, put the case in a state of on-going uncertainty. We shall conclude

---

* Eldridge, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

that the appeal, though from an interlocutory order, is properly before us, and we shall hold that the conditions attached to the award of custody are impermissible. That will end this case and therefore make it both unnecessary and inappropriate for us to address the right-to-appointed-counsel issue. The recusal issue will also become moot.

## BACKGROUND

During the year 2001–02, when the events most relevant to this case unfolded, Ms. Frase was a 31–32–year–old single mother of three children, by three different fathers, and was pregnant with a fourth child by yet another man. Her life and that of her children had been anything but stable, due in large measure to her erstwhile unreadiness to act as a responsible parent and her abuse of alcohol and drugs.[1] Her eldest son Justin (age 12) had been with Ms. Frase's mother, Ms. Keys, since birth and had been in Ms. Keys's legal custody for about 10 years.[2] Ms. Frase admitted that there was little maternal contact between her and Justin and that she was more like an aunt to him. In the year or two before this case commenced, Ms. Frase and the younger two children, Tara (age 8–9) and Brett (age 2–3), had no permanent home. There was evidence that Tara had been "in and out" of Ms. Frase's care, that, for a time in 1997 when Ms. Frase was incarcerated for driving under the influence of alcohol, Tara was with Ms. Keys, that at

---

**1.** Ms. Frase admitted to convictions for driving under the influence of alcohol, shop-lifting, providing alcohol to a minor, and possession with intent to distribute marijuana. Her mother added that Ms. Frase began with drugs and alcohol as a teenager and that it got worse as she got older.

**2.** Ms. Keys said that her daughter returned to her home when she was seven months pregnant with Justin, that she remained there for about three months after Justin was born, but that she then wanted to get on with her social life and moved to Ocean City, where she remained until Justin was 18 months old. When her "relationship" in Ocean City ended, she returned to Ms. Keys's home, but was "in and out." When Justin was three years old, Ms. Keys obtained legal custody of him. Ms. Frase admitted that, when Justin was born, she was "not ready to be a parent," that she "was drinking" and "did drugs," and "[j]ust wanted [her] freedom."

some point she was with a foster family in Dorchester County, and that in the immediate past year she had attended four different schools because of Ms. Frase's frequent moves.

In November, 2001, Ms. Frase, who, with Justin, Tara, and Brett, was then living with Ms. Keys, was arrested on a failure-to-appear bench warrant based on an earlier charge of possession with intent to distribute marijuana, and she spent the next eight weeks in the Talbot County Detention Center.[3] Upon her arrest, Ms. Frase asked her mother to place Tara and Brett with a couple Ms. Frase knew, but Ms. Keys instead found two other couples, whom Ms. Keys knew from her church, to take the children. The Barnharts took Brett and also Justin, and Mike and Jeanne Eskow took Tara.[4] When Ms. Frase was released, on January 15, 2002, she recovered Tara from the Eskows, at least for a time, but, because of a lack of cooperation on the part of her mother, she was unable to recover Brett from the Barnharts until January 19.

At some point, Ms. Frase moved into a trailer occupied by two other adults—Robert Johnson, who had recently been released from prison after serving time for violation of probation based on a burglary or breaking-and-entering conviction and by whom she soon became pregnant, and Mr. Johnson's mother—and occasionally by another child who, as best we can tell, was Mr. Johnson's nephew. Because of the crowded condition there, Ms. Frase allowed the Eskows to retain physical custody of Tara for some period of time. Although it appears that Ms. Frase received some sporadic child support from one or more of the fathers of her children, the evidence

---

3. In January, 2002, Ms. Frase pled guilty to the underlying charge and was sentenced to 18 months in jail, with all but the time served on the warrant suspended.

4. It appears that Justin was placed with the Barnharts because Ms. Keys was working in New Jersey. Ms. Frase indicated that her mother was "ready to get on with her own life [and] doesn't want to raise him anymore." Ms. Keys, who is a nurse doing contract work, said that her work in New Jersey was temporary and that she planned to take Justin back.

was that the fathers do not participate in the children's lives or, indeed, ever see the children.

Three days after returning Brett to Ms. Frase, the Barnharts filed a complaint for custody of the child. Ms. Frase filed a *pro se* answer and a counterclaim for custody. She later testified that she contacted a number of legal service agencies in an effort to obtain counsel but, because of either overload or conflicts, they were unable to provide an attorney for her. At a scheduling conference held on April 15, 2002, she asked the domestic relations master to appoint an attorney for her son, but she did not ask that counsel be appointed for her. The master denied the request but suggested that she go to the "pro se clinic." Although it appears that Ms. Frase was able to obtain legal advice from time to time and was well represented in this appeal, she did not have an attorney at any time in the trial court.

The evidentiary hearing, held before the master, commenced on May 20 and extended over two days. Ms. Frase did not ask that counsel be appointed for her, although she did request that one of her witnesses be excused from sequestration in order to assist her. That request was denied. Ms. Frase testified, presented witnesses on her behalf, and cross-examined witnesses produced by the Barnharts. She admitted to a past drug problem but said that she had completed a six-month intensive addictions program, that she was then drug-free and no longer had an alcohol problem, and that she was therefore no longer in counseling.[5]

On June 3, 2002, the master filed her report and recommendations. Though clearly suspicious of whether Ms. Frase would be able to make a permanent change in her life style, the master concluded that it was incumbent upon the Barnharts, as third-party strangers to Brett, to prove that Ms. Frase was unfit "or that they are the psychological parents of the child in question," and said that she was unable to make

---

5. At oral argument before us in this case, counsel for the Barnharts indicated, without contradiction, that Ms. Frase was currently in a drug treatment program of some kind.

that determination. The master found that, since Ms. Frase reunited with Brett, she had "developed a network to assist her with getting her life on track and appears to be cooperating with them in every respect." People from the support agencies had testified that Brett was attached to his mother and was a happy child. "Maybe," the master added, "this is the turning point in her life and she will bring some real joy to her children's lives."

Upon those findings, the master recommended that (1) Ms. Frase be awarded custody of Brett, "provided that she immediately apply for and obtain housing at Saint Martins House (they have indicated that they expect to have a vacancy shortly)," (2) with the permission of the Barnharts, Brett "spend every other weekend with them for as long as Justin is in their household," (3) Ms. Frase "continue to cooperate with the Family Support Center and Caroline County DSS," and (4) "this matter be reviewed in ninety days."

Ms. Frase filed handwritten exceptions in which, at the outset, she averred that her right to counsel had been denied and that she had "asked the court to appoint me a lawyer." She disputed a number of the subsidiary findings made by the master but complained principally about two of the conditions attached to the award of custody—that she move to St. Martin's House and that Brett be required to visit at the Barnharts. The required move, she said, would deprive the father of her unborn child of his right to parent the child, would require that she give up her church and reduce her attendance at the Family Support Center, and may require that she give up her job and current day care arrangement with no guarantee of being able to find a new job or day care replacement. She complained also about the costs involved, noting that St. Martin's required that she turn over 30% of her income, which she needed to feed and clothe her family.

With respect to the visitation requirement, Ms. Frase agreed that Brett and Justin should see each other, but she noted that Ms. Keys and the Barnharts were allowing her no contact with Justin, that although she had agreed to sibling

visitation through the Department of Social Services, the Barnharts had not agreed to that approach, and that visitation involving all three children had been overlooked. She complained as well that the Barnharts really were strangers to Brett, having had contact with him for only about six weeks. She asked that (1) she not be required to move, (2) more suitable visitation, through the Department of Social Services and involving all three children, be arranged, (3) an attorney be appointed for her, and (4) if necessary, another hearing be scheduled.

The court initially denied the exceptions because Ms. Frase had failed to comply with a court directive to identify in writing the part of the testimony taken before the master that she felt was relevant, but it granted her motion for reconsideration and held a non-evidentiary hearing on the merits of the exceptions. At the hearing, the court first considered the master's recommendation that Ms. Frase move to St. Martin's House. The court noted that it could do no more than require that Ms. Frase make application, which Ms. Frase said she had already done. She added that, because she had indicated to St. Martin's that she did not really want to be there, she was not accepted. Counsel for the Barnharts essentially verified that fact, but somewhat more pointedly—that Ms. Frase had told the person at St. Martin's that she had no intention of going there, and that it was on that basis that she was rejected. Unable to determine whether a real application had been made, the court left the matter for resolution at the review hearing ordered by the master.

With respect to the visitation, the court interpreted the master's recommendation to require sibling visitation between Brett and Justin, so that the relationship between them could be maintained, not visitation between Brett and the Barnharts. Given the crowded condition at the trailer where Ms. Frase was living, the Barnharts wanted the visitation to occur at their home. Although Ms. Keys still had legal custody of Justin, he had been living with the Barnharts, who had received permission from Ms. Keys to make decisions in his behalf. Ms. Frase noted that Tara was then living with her

and that Tara should be included in the visitation as well. She asked that Justin visit at her home. The court initially decided that the visitation, for some indefinite period every other weekend, occur at Ms. Keys's home, if Ms. Keys, who was not in court, would agree to that arrangement, but it then ordered one mediation session, without cost, to attempt to resolve the time and place of the visitation. If arrangements could not be made to have the visitation occur at Ms. Keys's home, it would occur at the Barnharts' home.

The court implemented these directives in three orders filed September 16, 2002. In those orders, the court (1) awarded custody of Brett to Ms. Frase, "provided she make application for housing at St. Martin's House," (2) established "visitation" between Brett and Justin every other weekend, (3) directed that the visitation occur at Ms. Keys's home, if she agreed, otherwise at the home of the Barnharts, (4) ordered that "the issue of visitation" be mediated and, to that end, ordered the parties to attend one mediation session, without cost, and directed that the court be advised of the results of the mediation, (5) required Ms. Frase to continue to cooperate with the Family Support Group and the county Department of Social Services, and (6) scheduled "this matter" for review on November 4, 2002. No appeal was taken from those orders.

On October 23, 2002, Ms. Frase filed an "Emergency Motion" to have the conditions attached to the custody order stricken. She repeated her complaint that requiring her to apply to St. Martin's would force her to leave the home of the father of her unborn child. Citing, by name, *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), she argued also that the visitation requirement interfered with her fundamental right to direct the care and upbringing of her children. The one new complaint was that, in reviewing the 1993 court file relating to the award of Justin's custody to her mother, she discovered for the first time that the master in this case had served as her mother's attorney, that the master had omitted to mention that fact, that the master was biased, that she had personal knowledge of disputed facts, and that the hearing she had just conducted was unfair. She averred

that the master had denied her request for counsel and urged that representation was then even more important. Citing her pregnancy and alleging that she was due to deliver on December 5 and was then experiencing pre-term labor, she requested that the review hearing scheduled for November 4 be postponed until February, so that she could have her baby without unnecessary stress and also have an opportunity, unless the court was willing to provide counsel for her, to prepare her case.

On November 1, 2002, the court denied the request for postponement of the November 4 review hearing but made no express ruling on the other requests included in the emergency motion. The hearing thus took place as scheduled, before the same master who, though presumably then aware of the recusal request, continued to act in the matter. The master was informed that, as a result of the mediation session, it was agreed that visitation between Brett and Justin would occur monthly and that two visits had taken place. The Barnharts complained that Ms. Frase had insisted that they not take the children from Ms. Key's home unless Ms. Keys was present, and there was some disagreement whether Brett was in a car seat when Ms. Frase delivered him. The master was upset that Ms. Frase had not made arrangements to move to St. Martin's House. No decisions were made at the review hearing, other than to schedule another such hearing in February, 2003. On November 25, 2002, Ms. Frase filed an appeal from the November 1 order, and, apparently, further review hearings were stayed pending resolution of the appeal. We granted *certiorari* prior to any proceedings in the Court of Special Appeals.

## DISCUSSION

### *Appealability*

An appeal may not be taken from a decision made by a Circuit Court unless the appeal is filed timely and the decision appealed from (1) constitutes a duly entered final judgment within the meaning of Maryland Code, § 12–301 of the Courts

and Judicial Proceedings Article (CJP), (2) is given the status of a final judgment under the court-created collateral order doctrine, or (3) constitutes the kind of interlocutory order that is made immediately appealable by CJP § 12–303.

With exceptions not relevant here, Maryland Rule 8–202 requires that, to be timely, an appeal must be filed within 30 days after entry of the judgment or order from which the appeal is taken. The notice of appeal filed by Ms. Frase on November 25, 2002 was stated to be from the order entered on November 1. That, indeed, was the only order from which an appeal could be regarded as timely taken, as it was the only order entered within the preceding 30 days. The November 1 order clearly did not constitute a final judgment under CJP § 12–301, and, as Ms. Frase does not contend that it qualifies as final under the collateral order doctrine, we need not consider that prospect. The sole basis for immediate appeal asserted by Ms. Frase is that the November 1 order constitutes an interlocutory order "[d]epriving a parent, grandparent, or natural guardian of the care and custody of his child, or changing the terms of such an order" and, for that reason, is immediately appealable under CJP § 12–303(3)(x).

Two issues are presented: first, whether the November 1 order constitutes an interlocutory order; and second, if it does, whether it falls within the ambit of CJP § 12–303(3)(x). Normally, those issues would not be difficult to resolve. In this case, however, the court, through the conditions added in its September 16 orders, has created some unfortunate confusion that impacts on both the appealability and the validity of the November 1 order.

The word "interlocutory," in the context of an order or judgment, is defined in Black's Law Dictionary (7th ed.1999) as "interim or temporary, not constituting a final resolution of the whole controversy." *Id.* at 819. Black's defines an "interlocutory order" as one "that relates to some intermediate matter in the case; any order other than a final order." *Id.* at 1123. That description is generally consistent with how we have viewed the distinction between final and interlocutory

orders. *See* Maryland Rule 2–602 and the legion of cases decided under CJP §§ 12–301 and 12–303.

■ Child access (custody and visitation) orders are ordinarily of two types. The normal progression of a contested child access case is for there first to be a *pendente lite* determination, designed to provide some immediate stability pending a full evidentiary hearing and an ultimate resolution of the dispute. The child is often traumatized enough by the separation that engenders the dispute, and, to the extent possible, the courts look to avoid any further unnecessary immediate disruptions in the child's life. A *pendente lite* order is not intended to have long-term effect and therefore focuses on the immediate, rather than on any long-range, interests of the child. As a result, although it should not be changed lightly, lest the stability intended by it be diminished, it is subject to modification during the pendency of the action, as current circumstances warrant, and it does not bind the court when it comes to fashioning the ultimate judgment. *See Kerns v. Kerns*, 59 Md.App. 87, 97, 474 A.2d 925, 930 (1984); *Leary v. Leary*, 97 Md.App. 26, 52–53, 627 A.2d 30, 43 (1993); *Kovacs v. Kovacs*, 98 Md.App. 289, 311–12, 633 A.2d 425, 436 (1993), and *cf. Knott v. Knott*, 146 Md.App. 232, 262, 806 A.2d 768, 785 (2002).

At some point, hopefully with dispatch, the issue comes before the court for "final" resolution, either through agreement of the parties or on evidence presented at a trial conducted by the court or a master appointed by the court.[6]

---

6. *See* Maryland Rule 9–208, governing the referral of family law issues to a master. Unless authorized under the court's case management plan or agreed to by the parties, contested custody issues that are not *pendente lite* in nature or that do not involve the modification of an existing order are not among the matters that the Rule permits to be referred to a master. Rule 9–208(a)(1)(F) permits referral of *"pendente lite* custody of or visitation with children or modification *of an existing order or judgment* as to custody or visitation."* (Emphasis added). Rule 9–208(a)(1)(K) allows other matters arising under title 9, chapter 200 to be referred as set forth in the court's case management plan, and Rule 9–208(a)(2) permits referral by agreement of the parties. The basis for

The court then has the benefit of either an agreement or the full record of evidence, and, based thereon, it renders a "final" decision that disposes of the petition in terms of what is in the long-term overall best interest of the child.

■ Because the court retains continuing jurisdiction over the custody of minor children, no award of custody or visitation, even when incorporated into a judgment, is entirely beyond modification, and such an award therefore never achieves quite the degree of finality that accompanies other kinds of judgments. Nonetheless, as we pointed out in *McCready v. McCready,* 323 Md. 476, 481, 593 A.2d 1128, 1130 (1991), "[a]n order determining custody must be afforded some finality, even though it may subsequently be modified when changes so warrant to protect the best interest of the child." *See also Hardisty v. Salerno,* 255 Md. 436, 439, 258 A.2d 209, 211 (1969) ("[W]hile custody decrees are never final in Maryland, any reconsideration of a decree should emphasize changes in circumstances which have occurred subsequent to the last court hearing."); *Wagner v. Wagner,* 109 Md.App. 1, 674 A.2d 1 (1996). In *Haught v. Grieashamer,* 64 Md.App. 605, 611, 497 A.2d 1182, 1185 (1985), the Court of Special Appeals observed that such an order, if possessing the other required attributes of finality, was a judgment as defined in Maryland Rule 1–202(n) and was therefore subject to Maryland Rule 2–535:

> "Accordingly, if a request for modification filed more than 30 days after entry of the order is based on any ground other than a change in circumstances since the order was entered, the court is without authority to grant the request unless the movant establishes (1) that the court was without jurisdiction to enter the order in the first instance, lack of jurisdiction being cognizable at any time, (2) that the modification seeks no more than the correction of a clerical mistake under Rule 2–535(d), or (3) that the order was the product of fraud, mistake, or irregularity, that the movant

---

the referral of this contested custody dispute, which did not involve modification of an existing order, is not clear from this record.

made the request in good faith and with ordinary diligence, and that he has a meritorious defense to the order."

The only caveat, noted in *McCready,* 323 Md. at 481–82, 593 A.2d at 1130–31, is where the request for modification is based on "prior facts existing but unknown and not reasonably discoverable at the time of the entry of the original order, such as the fact that a parent to whom custody had been granted was, and continues to be, a sexual abuser of the child." *See also Wagner,* 109 Md.App. at 28–29, 674 A.2d at 14.

The orders entered by the court on September 16 were, at the very least, ambiguous with respect to this degree of finality, and that, as we have said, impacts on the nature of the ensuing November 1 order. They were entered after an evidentiary hearing conducted by the master, upon exceptions taken from the master's findings and recommendation. They were based on the court's acceptance of the master's inability to find that Ms. Frase was not a fit custodian (and thus, implicitly, the master's finding that Ms. Frase *was* a fit person to have custody of Brett). No finding, even tentative in nature, was made by either the master or the court that exceptional circumstances existed which would make the award of custody to Ms. Frase detrimental to Brett's best interest. Accordingly, any award of custody to the Barnharts at that point would have been error. *See Shurupoff v. Vockroth,* 372 Md. 639, 814 A.2d 543 (2003). The court therefore awarded custody of Brett to Ms. Frase, but added the proviso that "she make application for housing at Saint Martin's House," and directed that "this matter be scheduled for a review on November 4, 2002 at 1:30 p.m."—some six weeks hence.

When the court seemingly conditioned its award of custody to Ms. Frase on her making application to St. Martin's House (and presumably moving there if accepted) and set the matter in for a subsequent review hearing, it created a substantial uncertainty as to whether that order was intended to be a "final" disposition of the matter or whether the court was still

acting *pendente lite.*[7] What did the court intend to happen if Ms. Frase did not make a new application, or if she did make one and it was not accepted, or if she entered St. Martin's but then found other housing and left? Were the Barnharts to be awarded custody, even in the absence of a finding of unfitness on Ms. Frase's part or the kind of exceptional circumstances that would be necessary to warrant an award to them, or did the proposed move to St. Martin's affect only the visitation arrangements—whether visitation between Brett and Justin would occur at St. Martin's rather than somewhere else? Did the court intend its September 16 orders to be sufficiently final to permit an appeal by the Barnharts, who clearly had not prevailed? As legal strangers to Brett, they did not fall within the protective ambit of CJP § 12–303(3)(x) and could appeal only if that order was final in nature.

The dilemma is this: if any of the September 16 orders were intended to be final in nature, sufficient to permit an appeal, the November 1 order could have no meaning. It might be regarded as interlocutory in the sense that it was not final, but there would be nothing to follow it, nothing to which it would be preliminary. Subject to a reopening upon a new petition and changed circumstances, the case would have been over and the time for noting an appeal long elapsed. If, on the other hand, the September 16 orders were, themselves, interlocutory in nature, the case had not ended, and the November 1 order also would be interlocutory. Supporting that view is the clear indication that, notwithstanding that on the record then before it there was no legal basis upon which to deprive Ms. Frase of her existing custody of Brett, the court obviously intended for there to be some further proceed-

---

7. That uncertainty was exacerbated by the order for mediation of the visitation issue. Clearly, the court did not intend for its September 16 orders to be final as to visitation. In one order, it stated that the purpose of the mediation was for "scheduling" the visits it had ordered between Brett and Justin, either at Ms. Keys's home or at the Barnharts' home. In another order it stated that the mediation was "for the purpose of establishing a visitation schedule." The court anticipated that, if the parties reached an agreement on whatever was submitted to mediation, it would be entered as an order of court.

ing in the matter, even though the function of that proceeding is, at best, murky.

An order cannot be regarded as final in nature unless, among other things, the court intends for it to be "an unqualified, final disposition of the matter in controversy." *Rohrbeck v. Rohrbeck*, 318 Md. 28, 41, 566 A.2d 767, 773 (1989). *See also Circuit City v. Rockville Pike*, 376 Md. 331, 347, 829 A.2d 976, 985 (2003). We shall therefore construe the September 16 orders as interlocutory in nature, which, as noted, makes the November 1 order interlocutory as well. The question then becomes whether the November 1 order had the effect of depriving Ms. Frase of the custody of her child, necessary to make it immediately appealable under § 12–303(3)(x).

On its face, the November 1 order merely denied Ms. Frase's request to postpone the review hearing scheduled for November 4, 2002. If that, in fact, was its only effect, it would not be appealable under CJP § 12–303(3)(x), for the refusal to postpone the scheduled hearing in no way deprived Ms. Frase of custody. The order had a much broader effect, however.

The motion to which that order responded sought several things. In addition to the request that the review hearing be postponed, it asked that the conditions attached to the custody determination—the requirement that Ms. Frase apply for admission to St. Martin's House (and presumably move and remain there for some indefinite period of time if accepted) and the requirement that she present Brett at Ms. Keys's house or the Barnharts' house for visitation with Justin—be eliminated as impermissible under *Troxel v. Granville, supra.* It also asked that the master be recused and that counsel be appointed for Ms. Frase.

The effect of denying the postponement was clearly to deny those requests as well. The presumed purpose of the review hearing was to consider how the conditions ordered by the court in September were being implemented; by allowing that hearing to proceed, the court necessarily was denying the request to strike those conditions. The hearing was to take place, and did take place, before the very master that Ms.

Frase asked be recused; by allowing the hearing to proceed, the court necessarily denied the request that the master be recused. Ms. Frase informed the court that she was without counsel and that, in light of the master's conflicted situation, she was more than ever in need of an attorney; by allowing the hearing before that master to proceed three days hence without appointing counsel, the court necessarily denied her request for the appointment of counsel.

It has long been recognized, in Maryland and elsewhere, that motions may be denied by implication. In *Wimberly v. Clark Controller Co.*, 364 F.2d 225, 227 (6th Cir.1966), the court noted that "[w]hile it is certainly the better practice to specifically rule on all pending motions, the determination of a motion need not always be expressed but may be implied by an entry of an order inconsistent with the granting of the relief sought." *See also Malbon v. Pennsylvania Millers Mut. Ins. Co.*, 636 F.2d 936, 939 n. 8 (4th Cir.1980) (same); *Mosier v. Federal Reserve Bank of N.Y.*, 132 F.2d 710, 712 (2nd Cir.1942) (citing 42 Corpus Juris 511 for the proposition that "the entry of an order inconsistent with granting the relief sought is a denial of the motion"); *Norman v. Apache Corp.*, 19 F.3d 1017, 1021 (5th Cir.1994) (denial of motion, though not formally expressed, "may be implied by the entry of a final judgment or of an order inconsistent with the granting of the relief"); *Cohen v. Curtis Publishing Co.*, 333 F.2d 974 (8th Cir.1964); *Toronto–Dominion Bank v. Central National Bank & Trust Co.*, 753 F.2d 66 (8th Cir.1985); *Zoline v. Telluride Lodge Association*, 732 P.2d 635 (Colo. 1987). The Court of Special Appeals has held likewise in a number of cases. *See Hawes v. Carberry*, 103 Md.App. 214, 216, 653 A.2d 479, 480 (1995); *Hawes v. Liberty Homes, Inc.*, 100 Md.App. 222, 226, 640 A.2d 743, 744–45 (1994); *Dallas v. Environmental Health*, 77 Md.App. 350, 356–57, 550 A.2d 422, 425 (1988).

The implicit denial of Ms. Frase's requests that the master be recused and that counsel be appointed for her does not fall within any of the kinds of orders made immediately appealable under CJP § 12–303, so if that, coupled with the denial of the

requested postponement, were the total effect of the order, we would be obliged to dismiss this appeal. The implicit denial of the request to strike the conditions attached to the custody order is different, however. That implicates, in at least two respects, CJP § 12–303(3)(x).

The provisions of § 12–303, allowing immediate appeals from certain kinds of interlocutory orders, has an ancient history, most of which was traced by the Court of Special Appeals in *Della Ratta v. Dixon*, 47 Md.App. 270, 422 A.2d 409 (1980). The statute presents a selected list of exceptions to the general rule that appeals may not be taken from interlocutory orders. As Chief Judge Gilbert pointed out for the Court of Special Appeals in *Flower World of Amer. v. Whittington*, 39 Md.App. 187, 191–92, 385 A.2d 85 (1978), the general rule precluding such appeals is sound, for "[w]ere the rule otherwise, the appellate courts would be inundated with all sorts of pretrial rulings to review, which might or might not affect the ultimate outcome of the case." The "common denominator of the exceptions," he noted, "is the irreparable harm that may be done to one party if he had to await final judgment before entering an appeal." *Id.* at 192, 385 A.2d at 88.

The authority to appeal from orders that deprive a parent, grandparent, or natural guardian of custody of his or her child is a relatively late addition to the list of interlocutory equity orders immediately appealable, being first enacted in 1920. *See* 1920 Md. Laws, ch. 274. The scope of that exception needs to be viewed in light of the interest at stake. In *Taylor v. Taylor*, 306 Md. 290, 296–97, 508 A.2d 964, 967 (1986), we pointed out that the term "custody," in the context of a minor child, embraced two different concepts—"legal custody," which embodies "the right and obligation to make long range decisions involving education, religious training, discipline, medical care, and other matters of major significance concerning a child's life and welfare," and "physical custody," which involves "the right and obligation to provide a home for the child and to make day-to-day decisions required during the time the child is actually with the parent having such custody." Al-

though the two do not always flow together, in that, in a proper case, the court may create a shared legal custody between parents and yet award primary physical custody to one of them, in this instance, the two did coalesce. There is nothing in the court's remarks or its orders to suggest an intent not to have both legal and physical custody of Brett reside with Ms. Frase.

 The parents of a minor child are the natural guardians of the child. Neither has a preference over the other with respect to custody of the child, but each has a preference over any third party. *See* Maryland Code, § 5–203 of the Family Law Article; *Shurupoff v. Vockroth,* 372 Md. 639, 814 A.2d 543 (2003). When a court deprives a parent of either "legal" or "physical" custody therefore, whether in favor of the other parent or in favor of anyone else, it is depriving that parent of the ability to exercise an important natural right, and that is what justifies the right of immediate appeal.

We have not before attempted to define the word "depriving," as used in § 12–303(3)(x). A standard dictionary definition of "deprive" is that it means both "to take away from forcibly; dispossess" and "to keep from having, using, or enjoying." *Webster's New Universal Unabridged Dictionary* 490 (Deluxe Second Ed.1979). In a legal setting, the word must take its proper meaning from the context of its use. In most contexts, it requires more than a minimal intrusion on the particular property or interest but does not require a total and complete dispossession, and that is the proper approach here. The word "depriving," as used in § 12–303(3)(x), needs to be given a common sense meaning, and not be read as allowing immediate appeals from routine provisions that do not, in some special way, significantly interfere with a parent's ability to carry out the obligations inherent in custody.[8]

---

8. As an example, *pendente lite* custody orders usually provide weekly or monthly visitation for the non-custodial parent. In a sense, any visitation constitutes at least a temporal infringement on custody and to some extent a qualitative one as well, but we do not believe that the Legislature, in creating this limited exception to the normal rule pre-

In the normal custody case, especially when the dispute has been between a natural parent and a third party, subjecting a parent, found fit to have custody, to periodic future review hearings essentially converts an order that should effectively end the dispute into something more like a *pendente lite* order. Particularly when coupled with a caveat that the parent and child live at the specific place chosen by the court, it puts a serious damper on the parent's ability to make long-range plans for herself or the child and effectively removes the parent's discretion to provide a home for the child and make day-to-day decisions regarding his welfare. In so doing, it significantly infringes on and thus acts as a substantial, albeit partial, deprivation of the parent's legal and physical custody.

Because those two conditions effectively undermine the discretion that goes with legal and physical custody, Ms. Frase clearly could have appealed from the September 16 order that first embodied them. Had such an appeal been taken, we certainly would have recognized those conditions as serving, in some significant way, to deprive Ms. Frase of part of the care and custody of her child and not dismissed the appeal either as being from an order entirely in her favor or as one not allowed under CJP § 12–303(3)(x). Surely, then, if those conditions would be regarded as a deprivation of care and custody for the purpose of allowing an appeal from the order that first imposed them, they must have that same quality when viewed in the context of the court's subsequent refusal to strike the conditions. There may be other procedural or substantive defenses to a later appeal (including, where evident, laches, acquiescence, or, if there had been a previous appeal on the issue, law of the case), but an order declining to

___

cluding immediate appeals from interlocutory orders, intended for the custodial parent to be able to take an immediate appeal from such an order on the basis that he/she has been deprived of custody by that kind of visitation requirement. We are aware of no reported appellate decisions in Maryland allowing an immediate appeal by a custodial parent from an interlocutory order permitting routine visitation by a non-custodial parent.

strike those kinds of conditions does constitute an order that deprives a parent of part of the care and custody of the child and is therefore immediately appealable under CJP § 12–303(3)(x). The Barnharts' motion to dismiss this appeal is therefore denied.

### Validity of the Conditions

■ Ms. Frase attacks two of the conditions specified by the court—the visitation provision and the requirement that she apply for, and inferentially that she accept, residence at St. Martin's House, on the ground that they are substantively impermissible under principles laid down by the Supreme Court in *Troxel v. Granville, supra,* 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49. Before addressing the substantive validity of those conditions under *Troxel,* we note our disagreement with the procedure employed by the court, of purporting to decide the custody case, on exceptions from the master's report and recommendations, and yet setting conditions inconsistent with the custody awarded and subjecting Ms. Frase to periodic review hearings. The very thing that makes the order immediately appealable also erodes its validity.

It is common—and in some instances required—for juvenile courts, in dealing with children who have been found in need of assistance (CINA), to have periodic review hearings to monitor the progress of the child, the child's parents, and any other guardian or potential custodian. In that setting, of course, the child has already come under the direct jurisdiction and supervision of the court and may well be in the legal custody of the court. By statute, the court's comprehensive jurisdiction extends until either the child turns 21 or the jurisdiction is affirmatively terminated by the court. *See* CJP § 3–804(b). The context, which justifies the direct and continuing supervision of the court, is that, as part of the CINA finding, the court has determined that court intervention is required to protect the child's health, safety, and well-being. *See* CJP § 3–801(f) and (m).

The court's role is different in a normal private custody dispute. It is to take evidence and decide the dispute, so that the child and the other parties can get on with their lives. The court does not retain jurisdiction until the child turns 21, or even 18. Although the matter of custody, visitation, and support may always be reopened upon a showing of changed circumstances, the court's jurisdiction over the particular dispute ends when the dispute is resolved, which the law anticipates will occur within a reasonable time after the evidentiary hearing. Those kinds of cases are not to be strung out indefinitely, as though they were CINA cases.

For good cause, the court may hold a case open for a reasonable period to consider additional evidence, not available at trial but which the court finds necessary to a proper decision. What it may not do, however, is to proceed to make findings that would dictate a particular result and then subject the favored party to conditions inconsistent with that result and to continuing review hearings. When it does that, the case never ends; the child and the parties remain under a cloud of uncertainty, unable to make permanent plans. The court seemingly reserves the power to alter the custody arrangement at any time, even in the absence of a new or amended petition, based on a later review of circumstances known or predicted to exist at the time of the initial determination. That is procedurally impermissible.

This case well illustrates the problem. The court knew what Ms. Frase's current living arrangements were and understood that there was no assurance that she would be accepted at St. Martin's, or, if accepted, that she would remain there for any stated period of time. With that knowledge, it apparently found her fit to retain custody of Brett. Despite that finding, it left open the prospect that the custody could be changed if she failed to apply for admission to a specific place where she did not want to live, applied but was not accepted, or moved but later moved out. We have already concluded that the imposition of that uncertainty constitutes a deprivation of the parent's care and custody, sufficient to make the order appealable under CJP § 12–303(3)(x). We add here

that, absent some compelling and articulated reason to the contrary, it is procedurally inappropriate and thus not just appealable, but reversible. We have held the September 16 orders to be interlocutory because, in fact, they included those kinds of conditions, but, as a procedural matter, those conditions should not have been included. On the basis of the court's announced findings, the determination of custody embodied in the September 16 orders should have been the final judgment of the court.

The issue generated by *Troxel* concerns the substantive validity of the visitation provision and the implicit requirement that Ms. Frase move, with Brett (and Tara), to St. Martin's. *Troxel* involved a dispute over visitation between the natural mother of two children and the children's paternal grandparents. The father had died. Although the grandparents had regular visits with the children following their son's death, at some point the mother desired to limit the visitation to one short visit a month and special holidays.

The grandparents responded with a petition for extended visitation (two weekends of overnight visitation per month and two weeks in the summer) under a Washington statute that permitted *any* person to petition for visitation rights at *any* time and authorized the court to award such visitation rights merely upon a finding that visitation would serve the best interest of the child, regardless of any change in circumstances. After a hearing, the trial court awarded visitation privileges to the grandparents one weekend a month, one week in the summer, and for four hours on their respective birthdays. The Washington Supreme Court reversed that determination, holding that the statute permitting third-party visitation infringed on the mother's fundamental right to rear her children and, for that reason, was unconstitutional.

The U.S. Supreme Court affirmed that decision, although it took at least two of three Opinions to do so. In the plurality Opinion joined by three other members of the Court, Justice O'Connor acknowledged the important role that grandparents and other third parties often play in children's lives, as

recognized by statutes in the various States that seek to protect those relationships. That extension, she said, came with a cost, however, by "plac[ing] a substantial burden on the traditional parent-child relationship." *Troxel,* 530 U.S. at 64, 120 S.Ct. at 2059, 147 L.Ed.2d at 56. Justice O'Connor observed that the interest that parents have in the care, custody, and control of their children was "perhaps the oldest of the fundamental liberty interests recognized by this Court" and confirmed that the right of parents "to make decisions concerning" that care, custody, and control was an interest protected by the due process clause of the Fourteenth Amendment. *Id.* at 65–67, 120 S.Ct. at 2060, 147 L.Ed.2d at 56–57.

The problem with the statute at issue, she concluded, was its breadth: it allowed any third party to seek custody but contained no requirement, once a petition was filed, that the court "accord the parent's decision any presumption of validity or any weight whatsoever." *Id.* at 67, 120 S.Ct. at 2061, 147 L.Ed.2d at 57. Thus, "should the judge disagree with the parent's estimation of the child's best interests, the judge's view necessarily prevails." *Id.* The practical effect, in Justice O'Connor's view, was that the State court "can disregard and overturn *any* decision by a fit custodial parent concerning visitation whenever a third party affected by the decision files a visitation petition, based solely on the judge's determination of the child's best interests." *Id.* at 67, 120 S.Ct. at 2061, 147 L.Ed.2d at 57–58. Applying the presumption that fit parents act in the best interest of their children, the four Justices concluded:

> "Accordingly, so long as a parent adequately cares for his or her children (*i.e.,* is fit), there will normally be no reason for the State to interject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children."

*Id.* 530 U.S. at 69–69, 120 S.Ct. at 2061, 147 L.Ed.2d at 58.

The trial court's decision seemed premised on the notion that grandparental visitation was presumed to be in the

children's best interest, thus reversing the Constitutional pre-sumption that the parents know best what is in their children's best interest. Because the particular decision at issue amounted to an unconstitutional infringement on the parent's right to make decisions of that kind, the four Justices found no need to consider the broader issue of whether nonparental visitation statutes necessarily had to require a showing of harm of potential harm to the child. *Id.* at 73, 120 S.Ct. at 2064, 147 L.Ed.2d at 61.

Justice Souter agreed that "a parent's interests in the nurture, upbringing, companionship, care, and custody of chil-dren are generally protected by the Due Process Clause of the Fourteenth Amendment," and would simply have affirmed the view of the State Supreme Court that the statute at issue was invalid because it authorized a contested visitation order at the behest of any person at any time subject only to the best-interest-of-the-child standard. *Id.* at 77–79, 120 S.Ct. at 2066–67, 147 L.Ed.2d at 63–65 (Souter, J., concurring). Justice Thomas also agreed with the plurality that the Court's recog-nition of the "fundamental right of parents to direct the upbringing of their children" resolved the case but wrote to suggest that, in reviewing the resolution of such a fundamental right, the "strict scrutiny" test should apply. *Id.* at 80, 120 S.Ct. at 2068, 147 L.Ed.2d at 65 (Thomas, J., concurring).

Although *Troxel* happened to involve a visitation dispute, there is nothing in any of the Opinions announcing or concur-ring in the judgment to suggest that the Constitutional pro-scription against State interference with a fit parent's right to make basic decisions for his/her child is limited to issues of visitation, and, indeed, the cases relied on by the various Justices involved other areas of interference as well. *See Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (liberty interest of parents to provide for the education of their children); *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (same); *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (religious upbringing of child); *Parham v. J.R.,* 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979) (right to make certain medical

decisions for child). The underlying point, expressed in *Troxel*, is that the due process clause "does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a 'better' decision could be made." *Troxel*, 530 U.S. at 72–73, 120 S.Ct. at 2064, 147 L.Ed.2d at 61. This Court, on many occasions, has articulated and applied the same principles confirmed in *Troxel*. *See In re Yve S.*, 373 Md. 551, 819 A.2d 1030 (2003); *Shurupoff v. Vockroth, supra*, 372 Md. 639, 814 A.2d 543; *Boswell v. Boswell*, 352 Md. 204, 721 A.2d 662 (1998).

As noted, *Troxel* implicates two of the conditions imposed by the court—visitation and the move to St. Martin's. As in *Troxel*, Ms. Frase was not opposed to visitation between Brett and Justin; she simply wanted to control where it took place and to involve Tara. No deference was given to her view. Forcing her to transport Brett to another place, occupied by a person or persons who had proved hostile to her, is precisely the kind of interference that *Troxel* prohibits. The implicit requirement that she relocate, with her children, to St. Martin's was an even more drastic interference. Ms. Frase explained why she did not want to leave her present place of residence and why, in particular, she did not want to move to St. Martin's; she might have to give up her job and her day care resource and pay over to St. Martin's 30% of her income. As with the visitation issue, the court gave no deference at all to her objection but decided that it knew best where she should live. That, too, is the very kind of interference that *Troxel* prohibits.

Having found Ms. Frase to be a fit parent in her existing circumstances and having found no exceptional circumstance that would make her custody of Brett detrimental to his best interest, the court had no more authority to direct where she and the child must live than it had to direct where the child must go to school or what religious training, if any, he should have, or what time he must go to bed.

More than a year has elapsed since the orders under review were entered, and we do not know what the present situation is with Ms. Frase and Brett. It is clear from the record before us that the conditions attached to the custody award, including the setting of review hearings, are impermissible and therefore invalid. We shall remand the case to the Circuit Court with instructions to vacate those conditions. That is, of course, without prejudice to any further proceedings that may arise should a new petition be filed based on changed circumstances.

### Other Issues

The remaining issues raised by Ms. Frase are whether the court erred in not requiring that the master, who 10 years earlier had represented Ms. Keys in the custody case involving Justin, be recused, and whether Ms. Frase had a common law or State Constitutional right to court-appointed counsel because of her indigency. Because our mandate will direct that the conditions complained of by Ms. Frase be vacated, and that will end this dispute without the need for any further proceedings, both of those issues are moot. There will be no occasion for the master to have any further contact with the current case, and there will be no further proceedings in this case in which Ms. Frase may need or desire counsel.

In this circumstance, it would be especially inappropriate for us to address and rule upon the right-to-appointed-counsel issue. Ms. Frase has argued that she, and any other civil litigant who is unable to afford counsel, has a common law and State Constitutional right to have counsel appointed for her, either by the court or by some State or local agency. The common law right, she says, stems from a statute enacted by the English Parliament in 1494—11 Henry VII, ch. 12. That statute, among other things, required the judges of the King's Bench, upon the return of any writ that commenced a civil action, to assign to a "poor" plaintiff an attorney, who "shall give their Counsels, nothing taking for the same." Ms. Frase argues that this statute was made part of the common law of Maryland by Article 5 of the Maryland Declaration of Rights

and, although it has never been invoked or enforced in any way, has also never been repealed.

She claims, alternatively, that she has a right to a court-appointed attorney under (1) Article 19 of the Maryland Declaration of Rights, which, with the gloss of Article 46 of the Declaration, provides that every person, for any injury done to his/her person or property, "ought to have remedy by the course of the Law of the land, and ought to have justice and right, freely without sale, fully without any denial, and speedily without delay, according to the Law of the land," and (2) Article 24 of the Declaration of Rights, which is the State analogue to the due process clause of the Fourteenth Amendment.

Ms. Frase, as noted, is well represented by counsel in this appeal, and there is no assurance that, should any further litigation be brought by or against Ms. Frase, she would not be represented in that litigation. The evidence in this case documents (and we could take judicial notice in any event) that there are legal service agencies operating in Caroline County, where this case arose, and that lawyers in that county do engage in *pro bono publico* work. Ms. Frase said that she was not supplied with counsel by one of the legal service agencies because of an overload at the time. It would be entirely speculative whether that circumstance would exist should she desire counsel in the future, in some new case.[9] Given that speculative uncertainty, for us, now, to opine on the scope, meaning, and vitality of the ancient 1494 statute or to

---

9. We would have to speculate, as well, that none of the five lawyers and three law firms representing Ms. Frase in this appeal would continue to represent her in any further proceeding in the Circuit Court—that, having argued her right to the assistance of counsel, they would then abandon her—and that the Maryland State Bar Association, the University of Baltimore Family Law Clinic, the Women's Law Center of Maryland, the Legal Aid Bureau. Inc., the American Civil Liberties Union of Maryland, the House of Ruth Domestic Violence Legal Clinic, the Maryland Disability Law Center, the Maryland Legal Services Corporation, the Maryland Volunteer Lawyers Service, all of which filed *amicus curiae* briefs in her behalf, would do likewise. We shall not make that assumption.

find the right-to-counsel she posits hidden for 227 years in Article 19 or Article 24 of the Declaration of Rights would be wholly inappropriate.[10]

Should there be some further occasion for Ms. Frase to be called upon to appear before the master, we admonish the master to re-read and take note of Canon 3C(1) of the Code of Conduct for Judicial Appointees ("A judicial appointee should not participate in a proceeding in which the judicial appointee's impartiality might reasonably be questioned . . .") and the principles we set forth in *Sharp v. Howard County,* 327 Md. 17, 607 A.2d 545 (1992). Even if the master did not recall her previous connection with Ms. Keys at the time of the first hearing, she presumably was aware of the problem on November 4 and is certainly aware of it now.

ORDER OF CIRCUIT COURT FOR CAROLINE COUNTY DIRECTLY OR IMPLICITLY DENYING EMERGENCY MOTION FILED BY APPELLANT

---

**10.** To resolve the issue hinged on the English statute, we would have to determine, among other things, (1) whether that statute, which, to the best of our knowledge, has never been applied in the 379–year history of Maryland as a colony and State, is nonetheless currently a vital part of the Maryland common law, (2) if so, whether it is limited to plaintiffs, as it says, or should be extended by judicial fiat to defendants, like Ms. Frase, as well, (3) at what point the right attaches and how long it continues, and (4) if the right exists and the court is, indeed, required to appoint counsel, what would happen if the lawyer appointed, for one reason or another, refuses to take the case. *See Mallard v. United States District Court,* 490 U.S. 296, 109 S.Ct. 1814, 104 L.Ed.2d 318 (1989). If the right is to be found under either Article 19 or Article 24 of the Declaration of Rights, either the State or the counties would presumably have to set up a system to appoint and pay the attorneys. Even if we were to leave the fiscal and administrative aspects of such a mandate to the legislative and executive branches, we would at least have to determine in some way the kinds of cases to which the right attached. It is clear that the right asserted by Ms. Frase could never be limited, under the language of either the statute or the Constitutional provisions, solely to defendants in contested custody cases arising in Caroline County. Recognition of the right would carry an enormous fiscal impact and require a substantial administrative structure, yet counsel has given us not a clue, in their briefs or at oral argument, how this right could, in fact, be implemented. In States where this right is recognized, it has been provided for by statute. *See Mallard v. United States District Court, supra.* This is not the case to resolve that issue.

FRASE ON OCTOBER 23, 2002 REVERSED; CASE RE-MANDED TO CIRCUIT COURT FOR CAROLINE COUN-TY WITH INSTRUCTIONS TO MODIFY ORDERS EN-TERED ON SEPTEMBER 16, 2002 BY STRIKING ALL CONDITIONS IN THOSE ORDERS ATTACHED TO THE AWARD OF CUSTODY OF BRETT MICHAEL FRASE TO APPELLANT DEBORAH FRASE; COSTS TO BE PAID BY APPELLEES.

BELL, C.J.; ELDRIDGE and CATHELL, JJ., Concur.

Concurring opinion by CATHELL, J. in which BELL, C.J. and ELDRIDGE, J. join.

I concur with the majority in respect to the general result it reaches. In respect to the appealability issue, however, although I agree that the matters are appealable, I do so on the basis that what occurred here was a change in the conditions of custody and was, therefore, immediately appealable pursuant to the provisions of Courts and Judicial Proceedings Article, Section 12–303(3)(x).

I strongly disagree with the majority's refusal to address the primary issue presented to us—in my view the most certiorari-worthy issue in the case.

There are many attributes that contribute to the making of a good judge. They include honesty and integrity, intellect, scholarliness, hard work, attention to detail, proper temperament, diligence and thick skin, amongst others. It has been my experience since I have been on this Court, that all of my colleagues are amply imbued with these positive judicial characteristics. In my view, there is an even more important quality that all judges should strive to achieve—decisiveness. Judges decide. It is the very essence of what we do. And it can be argued that it is the most important element of a judge's role.

The majority declines to address an issue I believe to be properly presented that goes to the very center of the American constitutional, and extra-constitutional promises—equality under the law. I am fully aware that there may be serious

concerns as to the reaction of the other branches of government, of the organized Bar (and other members of the profession) and of the people, in respect to any decision this court might reach in addressing this most important question: do the poor receive equal treatment in a matter concerning the most basic of fundamental, and constitutional, rights—the matter of the custody, visitation, and control of children by their parents? Rather than answer, or attempt to answer it, the question is avoided by a majority of the Court.

It is always easiest to decline to address controversial issues. It is, perhaps, the safest thing to do, even for courts. But the avoiding of such issues is best left to the political processes of the other branches of government. It is our branch of government, the judiciary, under the express and implied doctrine of the separation of powers, to which the toughest and most difficult decisions are delegated. It is our primary role to ensure that the fundamental constitutional rights, which are reserved to the people, are protected. One of the most important roles of the judiciary is to see that the laws equally protect all people—the poor as well as the wealthy. Cicero, in his *De Re Publica De Legibus,* I, xxxii, 49, (as translated by Keyes) raised questions, one of which, with the majority's decision not to address it in this case, remains partially unanswered today. As relevant here he stated:

"Therefore, since law is the bond which unites the civic association, and the justice enforced by law is the same for all, by what justice can an association of citizens be held together when there is no equality among the citizens? For if we cannot agree to equalize men's wealth, and equality of innate ability is impossible, the legal rights at least of those who are citizens of the same commonwealth ought to be equal. For what is a State except an association or partnership in justice?"

In the consideration of whether counsel should be provided in cases involving a significant interference with, or loss of, the right to parent, the words of the late President Lyndon B. Johnson, even though spoken in a much different context, nonetheless convey an important message:

"We seek not just freedom but opportunity. We seek not just legal equity, but human ability. Not just equality as a right and a theory but equality as a fact and equality as a result."

Address, *Howard University Commencement Exercises,* June 4, 1965.

This Court has very recently considered the matter of the importance of the constitutional right of a parent—to parent. We noted in *In Re Adoption/Guardianship Nos.* J9610436 and J9711031, 368 Md. 666, 669–70, 796 A.2d 778, 780 (2002):

"Certain fundamental rights are protected under the Constitutions. Among those rights is the right to child rearing, *i.e.,* parenting. Supreme Court case law has consistently reaffirmed parental rights.

"We recently stated in *Boswell v. Boswell* that:

'A parent has a fundamental right to the care and custody of his or her child. The United States Supreme Court has upheld the rights of parents regarding the care, custody, and management of their children in several contexts, including child rearing, education, and religion. *See Wisconsin v. Yoder; Stanley v. Illinois*[405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)] (discussing the right of parents to raise their children); *Prince v. Massachusetts*[321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944)] (observing that "the custody, care, and nurture of the child reside first in the parents"); *Skinner v. Oklahoma*[316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942)] (stating the right to rear a child is encompassed within a parent's "basic civil rights")....'

"In accordance with the Supreme Court, Maryland has declared that a parent's interest in raising a child is a fundamental right that cannot be taken away unless clearly justified." [Citations omitted.]

*See also In re Mark M.,* 365 Md. 687, 705, 782 A.2d 332, 342–43 (2001).

Recently, in a case in which the issue of counsel was not present, the United States Supreme Court opined on the

importance of the rights of parents to raise their children without interference by non-parents, albeit the Court was addressing a very broad statute that permitted any person to petition for visitation rights. That Court stated, as relevant to the point I now make, that:

"The Fourteenth Amendment provides that no State shall 'deprive any person of life, liberty, or property, without due process of law.' We have long recognized that the Amendment's Due Process Clause, like its Fifth Amendment counterpart, 'guarantees more than fair process.' The Clause also includes a substantive component that 'provides heightened protection against government interference with certain fundamental rights and liberty interests.'

"The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children— is perhaps the oldest of the fundamental liberty interests recognized by this Court. More than 75 years ago ... we held that the 'liberty' protected by the Due Process Clause includes the right of parents to 'establish a home and bring up children' and 'to control the education of their own.' Two years later ... we again held that the 'liberty of parents and guardians' includes the right 'to direct the upbringing and education of children under their control.' We explained ... that '[t]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations.' We returned to the subject ... and again confirmed that there is a constitutional dimension to the right of parents to direct the upbringing of their children. 'It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.'

"... In light of this extensive precedent, it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children."

*Troxel v. Granville,* 530 U.S. 57, 65–66, 120 S.Ct. 2054, 2059–60, 147 L.Ed.2d 49, 56–57 (2000) (citations omitted).

I think it can be agreed that the quality of justice received, even in our system, arguably the best system of justice ever conceived, is impacted by the presence or absence, and the quality of, legal representation of the respective parties. I readily understand that it may well be beyond our power to create a perfectly equal system, but, that acknowledged, there is no acceptable reason to avoid doing what we can do, even if it is perceived that what we do may not be well received by other governmental entities that will have to address the impact of our rulings. As Justice Brandeis said in *Jay Burns Baking Co. v. Bryan,* 264 U.S. 504, 520, 44 S.Ct. 412, 416, 68 L.Ed. 813, 829 (1924), "if we would guide by the light of reason, we must let our minds be bold."

Without the willingness to address difficult and divisive issues by courts, there would not be any representation of poor criminal defendants and the public defender systems that have been created would not now exist; many school systems may not have yet been integrated; 'Jim Crow' would be not only alive, but vigorous, in some areas of our country. Without judges willing to resolve great issues there would be no 'right of privacy.' Without the courts' willingness to assume all of its responsibilities our country, and our state, might well be very different.

It is, in my view, an important function of this Court to answer questions such as is presented in this case—whatever way we answer it. And I believe that we, at the least, should begin the process of considering the matter of ensuring equal access to justice by determining whether, and if applicable, when, legal counsel should be provided for economically deprived parents, who become defendants at the instigation of the State, or of third parties as in this case, and are faced with the prospect of losing the most fundamental and constitutional of rights, the right to parent. By our failure to determine the constitutional limits of the rights, if any at all, of the indigent to provided representation, the issue remains a 'bouncing ball,'

subject to being bounced back and forth between the legislative, executive, and judicial branches of government, each branch leaving it to the other to address. Until the advocates for provided representation know whether such rights are constitutional in nature in the first instance, and if so, the limits of the constitutional rights, they cannot sufficiently take their case to the other branches of government. It is with this Court, not with the other branches of government, that the duty has evolved under the separation of powers doctrine, to determine constitutional issues. The answers being sought in this Court, whatever the answers may be, cannot be found anywhere else. In my view, we should no longer leave them, and this issue, in limbo.

A member of the criminal milieu of our society is guaranteed and provided counsel. But the majority of the Court today declines to resolve whether parents of low economic means, are entitled to a constitutional right to provided counsel in judicial proceedings which others have initiated in which parents may lose their right to be a full parent to their children. I think, simply, that it is wrong to avoid the issue.

The facts in the present custody related case are not even as egregious as many we see. In many cases a poor, sometimes undereducated and unsophisticated, parent is faced with the full might of the State, an entity that itself seeks to deprive the parent of his or her children. If a poor person is faced with the prospect of going to jail for a minor theft offense, she is provided counsel. Yet, if the same person is forced into court where she is faced with the prospect of losing a child, or losing partial or full parental rights, to the State or to a third party, she is not provided counsel.

While I certainly cannot speak for the individual judges of this Court, it is my belief that there is no judge on this Court that believes in his or her heart or mind, that justice is equal between the poor and the rich—even in the tradition hallowed halls of our appellate courts. Each of us knows, I believe, that an unrepresented parent involved in the appellate process in respect to custody, visitation, or parental termination issues,

when opposed by competent counsel for the opposing party (sometimes opposed by an organ of the State with its legions of lawyers), is normally not afforded the equal protection of the laws, *i.e.*, an equal access to justice to which all citizens are entitled—in spite of the efforts of this Court to afford that equality. With the constraints of the adversarial court system, and the prohibitions it (and our cases) place upon judges not to assist either side, the poor, unrepresented parent faced with experienced counsel on the other side is at a great, system-built-in, disadvantage.

I am fully aware that the United States Supreme Court in *Lassiter v. Department of Social Services,* 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (a case involving the State's attempt to terminate parental rights), over twenty years ago, held that the right to counsel under the federal constitution did not extend beyond the loss of physical liberty, stating:

> "The pre-eminent generalization that emerges from this Court's precedents on an indigent's right to appointed counsel is that such a right has been recognized to exist only where the litigant may lose his physical liberty if he loses the litigation. . . .

> . . .

> "Significantly, as a litigant's interest in personal liberty diminishes, so does his right to appointed counsel. . . .

> . . .

> "In sum, the Court's precedents speak with one voice about what 'fundamental fairness' has meant when the Court has considered the right to appointed counsel, and we thus draw from them the presumption that an indigent litigant has a right to appointed counsel only when, if he loses, he may be deprived of his physical liberty. It is against this presumption that all the other elements in the due process decision must be measured."

*Id.* at 25–27, 101 S.Ct. at 2158–59, 68 L.Ed.2d at 648–49.

But, as to the "due process" and "law of the land" provisions contained in the Declaration of Rights of the Maryland Consti-

tution, we are not constrained by the limitations the United States Supreme Court has appeared to place upon the interpretation of federal constitutional provisions. Even in *Lassiter*, which limited the federal requirement for provided counsel in civil cases to those cases where the parent's liberty was at risk, the Supreme Court noted the larger viability of the issue under the constitutions of the states. It noted, approvingly, that approximately 33 states already had provided for counsel for indigent parents in various types of termination proceedings, noting that it was "[m]ost significant [that] 33 States and the District of Columbia provide statutorily for the appointment of counsel in termination cases" and that its holding "in no way implies that the standards increasingly urged by informed public opinion and now widely followed by the States are other than enlightened and wise."

Many other states have chosen to address similar issues relating to counsel for indigent parents in custody or termination cases. Many of them, perhaps a majority, have concluded that legal representation is not constitutionally required. As an example, *see In the Matter of Ward v. Jones*, 303 A.D.2d 844, 846, 757 N.Y.S.2d 127, 129 (2003) ("[W]e decline the invitation to equate 'fundamental fairness' with a constitutional right to the appointment of assigned counsel for all indigent parents seeking visitation with their children") (alteration added). There are many more state courts that basically ascribe to the *Lassiter* doctrine that the right to appointed counsel depends upon the possibility of incarceration even in the civil context. And some states have declined to decide the issue, while opining in respect to it.

One of the latter is *Brown v. Division of Family Services*, 803 A.2d 948 (Del.2002) (a proceeding involving placing children in foster care). There the Supreme Court of Delaware noted:

"When *Lassiter v. Department of Social Services* was decided twenty years ago, the United States Supreme Court noted that 'wise public policy . . . may require that higher standards be adopted than those minimally tolerable under the [United States] Constitution.' It then noted that '[i]n-

formed opinion has clearly come to hold that an indigent parent is entitled to the assistance of appointed counsel not only in parental termination proceedings, *but [also] in dependency and neglect proceedings as well.*

. . .

"Inextricably intertwined with the goal of achieving permanency for children is the issue of legal representation for all parties in child welfare proceedings. . . .

"Consequently, at the present time, the only parties to a dependency and neglect proceeding who are not provided with representation are the indigent parents. . . .

. . .

"Today, more than one-half of the states have established a right for indigent parents to be represented by counsel at State expense in dependency and neglect proceedings. That right has been recognized in those states by statutory enactments or as a matter of state constitutional law. It is not mandated by the United States Constitution."

*Id.* at 952–55 (footnotes omitted).

In many other states, statutes have been enacted requiring representation for the indigent parent in certain types of cases involving custody. And there are states where the courts in some cases have held that their constitutions require some level of appointed representation for the indigent parent, although most often in respect to termination cases. They include *Adoption of Holly*, 432 Mass. 680, 738 N.E.2d 1115 (2000), stating:

"In *Department of Pub. Welfare v. J.K.B.*, [379 Mass. 1, 3, 6, 393 N.E.2d 406, 407, 409], . . . this court concluded that, under the Fourteenth Amendment to the Constitution of the United States, and art. 10 of the Declaration of Rights of the Massachusetts Constitution, 'an indigent parent has a constitutional right to court-appointed counsel in a contested proceeding to terminate parental rights.' Counsel is not necessary when an indigent parent decides not to contest a

petition, and to obtain counsel, an indigent parent must 'timely make his or her decision [whether to contest a petition or to be heard] known to the court.' "

*Id.* at 688, 738 N.E.2d at 1121 (alteration added)(emphasis omitted).

In the over twenty years that have elapsed since *Lassiter*, the various governmental entities that are involved in the matter of custody, visitation and termination have been, as perhaps they should have been, ever more active in seeking to play a greater role in becoming involved in the raising of children. Third parties, such as in this case, have also become more active in seeking custody or visitation in respect to others' children. In that context, it is especially frightening to me to think that affluent third parties, by reason of the quality of the legal representation their affluence brings them, may be able to simply overwhelm poor parents who cannot afford counsel in a civil adversarial system that is not permitted to fully ensure equality in the presentation of cases.

I think it is also fair to say that some courts and some judges of this state (as well as on occasion social service personnel) have, in the past twenty years or so, become increasingly involved in day-to-day actions relating to the raising of children to the extent that their personal parental practices sometimes appear to have been substituted for the proper supervision and practices of the parents.

With the increasing frequency with which these issues arise, I am drawn more to the well reasoned dissents in *Lassiter*, as a guide to how this Court should consider these issues under our State Constitutional provisions in these evolving times. I am particularly accepting of Justice Blackmun's statement derived from a previous case in which he noted the *Gideon* standard: "... reason and reflection require us to recognize that in our adversary system of criminal justice, any person haled into court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided for him." *Id.* at 36, 101 S.Ct. at 2164, 68 L.Ed.2d at 655 (J. Blackmun, dissenting) (quoting *Gideon v. Wainwright*, 372 U.S. 335, 344, 83

S.Ct. 792, 796, 9 L.Ed.2d 799, 805 (1963)). The very same reason that a poor person without a lawyer cannot get a fair trial in a criminal case, applies equally in a civil case, especially of the nature of the case at bar. Fairness, logically, I would respectfully suggest, in the adversarial system, cannot be assessed differently in a civil case affecting the fundamental right to parent. A trial is fair or it is not, and the ultimate result, *i.e.,* incarceration or loss of parental rights, cannot change the fairness of the process. Once a fundamental and constitutional right is involved, a fair trial should be equally ensured. Justice Blackmun went on to opine:

"The question, then, is whether proceedings in this mold, that relate to a subject so vital, can comport with fundamental fairness when the defendant parent remains unrepresented by counsel. . . .

"At stake here is 'the interest of a parent in the companionship, care, custody, and management of his or her children.' This interest occupies a unique place in our legal culture, given the centrality of family life as the focus for personal meaning and responsibility. . . .

. . .

". . . Once an individual interest is deemed sufficiently substantial or fundamental, determining the constitutional necessity of a requested procedural protection requires that we examine the nature of the proceeding—both the risk of error . . . and the burdens created by its imposition.

. . .

"The Court, of course, acknowledges . . . that these tasks 'may combine to overwhelm an uncounseled parent.' I submit that this is a profound understatement. Faced with a formal accusatory adjudication, with an adversary—the State—that commands great investigative and prosecutorial resources, with standards that involve ill-defined notions of fault and adequate parenting, and with the inevitable tendency of a court to apply subjective values or to defer to the State's 'expertise,' the defendant parent plainly is outstrip-

ped if he or she is without the assistance of " 'the guiding hand of counsel." ' When the parent is indigent, lacking in education, and easily intimidated by figures of authority, the imbalance may well become insuperable."

*Id.* at 37–46, 101 S.Ct. at 2165–69, 68 L.Ed.2d at 656–62 (citations omitted) (footnote omitted). Justice Stevens, dissenting, stated in part:

"In my opinion the reasons supporting the conclusion that the Due Process Clause of the Fourteenth Amendment entitles the defendant in a criminal case to representation by counsel apply with equal force to a case of this kind. The issue is one of fundamental fairness, not of weighing the pecuniary costs against the societal benefits. Accordingly, even if the costs to the State were not relatively insignificant but rather were just as great as the costs of providing prosecutors, judges, and defense counsel to ensure the fairness of criminal proceedings, I would reach the same result in this category of cases. For the value of protecting our liberty from deprivation by the State without due process of law is priceless."

*Id.* at 59–60, 101 S.Ct. at 2176, 68 L.Ed.2d at 670.

To me, the right to fully parent one's children, without improper interference by third parties or the State, is too important and fundamental a right for the issue before us to be avoided. Also important is that the hearing and trial judges and masters need guidance in respect to this issue involving representation. They need guidance, even if the majority of the Court were to hold that appointed counsel is not necessary in order to afford fundamental fairness.

We should also be realistic. We can decline to address many problems. But, unlike many cases of a lesser nature, this issue will not go away. The parties will not settle this issue on remand. This issue will keep coming back in this case, or other cases, until four judges of this Court vote to resolve it one way or the other. The bullet will have to be bitten. More important, even, is that all participants in the process need to know the answer in respect to the Maryland

constitutional issues. So long as this Court declines to resolve it, the advocates for the poor will continue to seek judicial relief, rather than concentrating their efforts with the other branches of government. The poor need a yes or a no.

I am fully aware of the consequences of taking the first step onto the path of a civil *Gideon*. But the right we are asked to afford in the context of this case, addresses the most fundamental of rights. It is not in the nature of a speeding ticket, a civil violation of a zoning ordinance, a tortious interference with contract, or a breach of contract case. In my view it is much more fundamental, much more important. It is in the nature of the protection of the family. What can be more important? We should all try to imagine how it must feel to be utterly poor and to receive a summons from the hands of a sheriff informing us that we are required to appear in court because either the State or some third party is attempting to terminate our parental rights, or to interfere with them, and we don't have any money with which to hire a lawyer. The poor face fears without the security of the money that many others have. And it can be terrifying, to realize how helpless you are when others are attempting to take your children from you.

I would reach the third issue. More important I would resolve it by holding that in cases involving the fundamental right of parents to parent their children, especially when the parent is a defendant and not a plaintiff, counsel should be provided for those parents who lack independent means to retain private counsel. Whether there should be a panel that weeds out frivolous cases, whether there should be permanent civil public attorneys, whether courts should have the power to appoint counsel and apportion the costs to specific entities,[11]

---

11. In *State of Louisiana in the Interest of A.P.*, 815 So.2d 115, 118 (La.Ct.App.2002), that court, in a case involving custody issues, noted:
 "Louisiana courts have the inherent constitutional authority to order the state, its appropriate subdivision, department, or agency to provide for payment of counsel fees and necessary expenses when necessary for effective representation of indigents. The legislative and executive branches can aid this inherent judicial power, but their

are for others to resolve, or, perhaps, a matter for this Court to resolve in a different context under our rule making authority and our role as the overseer of our profession.

I would leave the consideration of the issue providing representation in respect to other types of civil matters to the cases that bring those issues before the Court.

Chief Judge BELL and Judge ELDRIDGE join in this concurrence.

acts or failure to act cannot destroy, frustrate, or impede that constitutional authority."